OPINION OF THE COURT
Jacqueline W. Silbermann, J.
This proceeding was commenced by an order to show cause wherein the petitioner alleged that he was unlawfully evicted and as a result thereof sought possession and treble damages. The order to show cause contained within it an ex parte order granting immediate possession to petitioner. The order granting possession was immediately enforced as per its terms by use of the Police Department of the City of New York.
Respondent cross-moved, inter alia, for an order restoring her to the premises and directing petitioner’s removal from the premises. The matter was tried before the court without a jury.
The facts as they were revealed prove the proposition that truth is often stranger than fiction. Moreover, the facts illustrate that the naive, unwary and/or uninformed *497 may find New York a treacherous city in which to live. The evidence reveals a case of fraud or subterfuge.
The court found Mr. Fish’s testimony incredible, indeed a “fishy” story, based on observation of demeanor, manner of testifying, facts elicited in cross-examination and inconsistencies in his testimony. This court heard testimony regarding Mr. Fish’s conviction by plea in 1977 for assault in the second degree. Mr. Fish was also convicted and sentenced in 1982 for possession of marihuana in New Jersey and spent time on a prison farm. The court discounts these convictions as having no probative value on the issue of his truthfulness or lack of it. However, other testimony by Mr. Fish clearly goes to the issue of his credibility.
Mr. Fish emphatically denied on cross-examination that he ever used a false name. He then admitted using the name Benjamin Friedlander 10 years ago. The testimony revealed he used the name Benjamin Friedlander to rent an apartment and to obtain a driver’s license. When pressed by counsel he confessed to using the name to open a checking account 6 or 7 years ago and using the name 3 or 4 years ago to obtain a Citicard. Finally, Mr. Fish stated that he does not remember when he stopped using the name Benjamin Friedlander.
Equally impressive to this court, on the issue of credibility, is his use of MFY Legal Services (MFY) to represent him in this trial. MFY is commonly known to represent only indigent or poor clients. To accomplish this they screen clients to ascertain eligibility. At trial Mr. Fish testified to the following assets:
1983 Assets:
1. Sale of 3 Utah condominiums on or about
May 1983 $22,500
2. Ownership of 2 more condominiums, unable to sell and unable to value, perhaps
worth $7,500 each (-)
3. Retainer from Deloitte, Haskins &
Sells CPA’s 6 weeks at $500 week. 3,000
4. Employment at various real estate
firms — salary unknown (-)
Total: $25,500 plus
*498 1984 Assets:
1. Commissions received from Equitable
Life Insurance Co., current employer $ 1,500
2. Commissions outstanding from Equitable
Life Insurance Co. 5,000
Total: $ 6,500 as of
May, 1984
Under the above facts in the court’s opinion Mr. Fish would not have been entitled to representation by MFY Legal Services based on monetary eligibility and that if he had disclosed these alleged facts to them prior to trial they would not have represented him. Alternatively, the foregoing was untrue and he has deceived the court. In either case, this testimony raised serious questions in the court’s mind with respect to his credibility.
The court also considered Mr. Fish’s testimony about his taking of Lithium on the issue of his ability to recall facts and his truthfulness. He claimed he got a prescription for Lithium eight years ago and is presently taking the drug based on his own assessment of the dosage required each day.
On the other hand, the court found Lynn Simpson’s testimony credible, if extremely naive. It was internally consistent as well as consistent with the testimony from the other witnesses testifying on behalf of Mr. Fish.
The following constitutes the court’s findings of fact based on a careful evaluation of the credibility of the witnesses and the exhibits.
The respondent Lynn Simpson moved into the subject premises sometime in 1969 and has resided there continuously, but for occasional vacations and visits with friends, until the present.
On or about late August or early September, 1983, Ms. Simpson’s neighbor, Nora Sacerdote gave Ms. Simpson’s telephone number to a business acquaintance of hers, Jonathan Fish. Ms. Sacerdote knew Mr. Fish was looking for a place to live and thought perhaps Ms. Simpson would want a roommate. As a result of the phone call from Mr. Fish a meeting was arranged at a restaurant. Mr. Fish told *499 Ms. Simpson he’d like to share her apartment and gave Ms. Simpson references. Ms. Simpson decided that there was something about Mr. Fish she did not like and decided against renting to him.
On or about the Labor Day weekend, 1983, while Ms. Simpson was away at Fire Island, Mr. Fish appeared at Nora Sacerdote’s apartment, which is in the same building as Ms. Simpson’s apartment, accompanied by his friend, Mr. Diaz, and armed with sanding equipment and other such paraphernalia. Nora Sacerdote and Patricia Cunningham were both dressed in bathing suits and ready to go to the beach. Mr. Fish by means of guile and pressure convinced them that Lynn Simpson had agreed to rent him the apartment. He said he was there with all his equipment ready to do work in the apartment but that he did not have the key. Without ever confirming Mr. Fish’s statements, or getting prior authorization from Ms. Simpson, Nora Sacerdote gave Mr. Fish the keys to the subject premises which were located in Ms. Cunningham’s apartment, which was also in the same building. Ms. Cunningham had possession of the key for purposes of watering Ms. Simpson’s plants while she was away.
Sometime in September, 1983, Ms. Simpson returned to her apartment from Fire Island to find Mr. Fish there with another man who he stated was his brother. She found one wall of her apartment with a hole in it about 18 inches by V2 inch in depth and paint splattered all over it, her sable brushes and oil paints ruined and a picture frame broken. The apartment was in great disarray. Mr. Fish told her that his brother had done the damage while drunk. After some argument as to the damage and how he got into the apartment without her permission, Mr. Fish with his cunning and sophistic manner convinced Ms. Simpson to let him retain her keys for the purpose of repairing the damage.
Ms. Simpson and Mr. Fish reached an agreement that he would repair the wall by removing the rest of the plaster to expose a brick fireplace that was behind the wall, and repaint it. Ms. Simpson and Mr. Fish went together to purchase many of the supplies. Some supplies were purchased by Mr. Fish and the cost of these were deducted *500 from the sum he owed Ms. Simpson for the damage done to certain of her personal property.
Instead of seeking help when she found Mr. Fish in "her apartment, Ms. Simpson was manipulated by the slippery Mr. Fish. Mr. Fish’s own witness described him as “a good salesman who could sell you almost anything”. He prevailed against her better judgment, never really giving her a chance to do anything to negate his occupancy.
Ms. Simpson, who was afraid of Mr. Fish, stayed with her fiancé during September, 1983 when Mr. Fish was doing the construction. During this time she returned to her apartment to check on the progress of the work and to collect her mail.
Sometime on or about the end of September or the beginning of October, 1983, Ms. Simpson noted the work Mr. Fish had agreed to do had been accomplished and that he had sanded the floors as well. She also noted he had moved in some furniture.
Mr. Fish kept refusing to leave. In fact, he threatened her with costly litigation alleging that he knew something about real estate having worked in the business, and that now that he had been in the apartment over 30 days she would have to bring a legal proceeding to evict him. Indeed, he had a real estate license and had worked in at least two real estate firms. He testified that his prior apartment had been an “illegal sublet”.
On or about the end of November or early December, Mr. Fish told Ms. Simpson he would shortly be vacating the apartment to go to one of his condominiums in the west. About the second week in December, 1983, Ms. Simpson returned to her apartment to find garbage bags strewn throughout with maggots crawling on them. She found burnt logs and ashes in varying locations indicating that fires had been set (and not just in the fireplace). Although the fireplace is of the nonworking variety, it too had been used. Some of Mr. Fish’s property was still in the apartment albeit strewn about and some had been removed. Ms. Simpson returned to the apartment two or three times over a period of five days. She found the apartment’s condition unchanged and apparently deserted. She discovered the telephone had been disconnected and the utilities unpaid.
*501 On December 22,1983, Ms. Simpson concluded from the condition of the apartment, coupled with Mr. Fish’s statements that he had at long last left her apartment and the City of New York. She therefore engaged a locksmith who changed the locks on her apartment and she recommenced residing therein.
On January 24, 1984, Ms. Simpson received a telephone call from Mr. Fish’s estranged wife requesting permission to pick up some of the personalty left by Mr. Fish which she said belonged to her and her son. During that conversation, Ms. Simpson asked Mrs. Fish to take all Mr. Fish’s things and not just the few items she had indicated. The call ended with Mrs. Fish saying she would call back.
At no time from about the second week in December until the end of February did Mr. Fish contact Ms. Simpson and indicate that he had any intention of returning to her apartment or claiming any possessory right to it.
The facts further indicate that on or about early December, Mr. Fish who has had prior incidents of mental problems had a breakdown. On or about December 12,1983, he was arrested as the result of a simple assault and breaking a restaurant window. A competency examination was ordered by the court and as a result Mr. Fish was confined to the prison division of Bellevue until January 13, 1984. Upon his release, he did not contact Ms. Simpson to regain his property or to assert any rights he now claims in the apartment; all claims by Mr. Fish to the contrary notwithstanding.
The first time Ms. Simpson learned of Mr. Fish’s claim of unlawful eviction was a telephone call from Mr. Fish’s attorney in late February, 1984. He stated unless she gave Mr. Fish immediate possession of the subject premises she would be served with papers forcing her to do so and seeking monetary damages.
Based on the facts she understandably assumed that the suggestion of a lawsuit or possession to Mr. Fish was without merit. She thus did not act upon the telephone call and within a couple of days was served with the “infamous” order to show cause. This order without a hearing resulted in the police forcibly reinstating Mr. Fish’s occupancy to the subject premises and the commencement of the instant *502 proceedings in a manner only Franz Kafka would have thought possible.
The order to show cause was served on Ms. Simpson at 7:30 a.m. on February 29, 1984 and was not returnable until March 6, 1984, the first date at which Ms. Simpson could object to any of its contents. Mr. Fish was forcibly installed into the subject premises with police assistance in accordance with the terms of the “Order”, within 12 hours of its service upon Ms. Simpson and prior to its return date. It is elementary that this order, which appears to have been signed due to error had the effect of denying Ms. Simpson her property without proper notice or any modicum of due process of law. The injustice that was done to Ms. Simpson by the order is even more manifest when one considers that there was not even an allegation in the petition that any emergency existed which necessitated Mr. Fish’s immediate entry into the apartment.
This court also notes that the petition, which was verified by petitioner, alleges that Ms. Simpson was not residing in the apartment and had not resided there in years. In fact she had resided in the apartment continuously since 1969. Even Mr. Fish at trial stated that he was to be her roommate. The petition states that Mr. Fish had paid rent of $310 a month since September, 1983. In fact, Mr. Fish never once paid rent for the apartment. His only payment was for the property he had broken or damaged. This court has found that he had not been in the apartment in two and one-half months at the time the order was signed. This would certainly have affected the granting of the order to show cause. Based on MFY’s telephone conversation with Ms. Simpson prior to bringing the order to show cause, petitioner had the ability to contact her. Thus there was no inability to reach her which would justify the order of possession without first giving notice and an opportunity to be heard. This is especially true since no emergency was alleged in the petition.
This court is of the opinion that orders to show cause such as this one which deprive respondents of their home without due process of law should not in the future be signed or indeed drafted by counsel. We call on our fellow Judges, lawyers, and the clerks of this court to be vigilant *503 in protecting the rights of respondents from such orders in the future. Further, this court calls on the Legislature to pass legislation insuring that such orders are never granted in the future unless exigent circumstances are present. Specifically, counsel for petitioner claims some justification from section D16-1.04 et seq. of the Administrative Code of the City of New York. It should be made clear by the city council whether this legislation was intended to justify actions such as were taken here.
The court is presented with the basic question of whether there has been a forcible entry and detainer by Ms. Simpson with Mr. Fish the victim. Can Mr. Fish invoke RPAPL 713 (subd 10) and 853 against Ms. Simpson. If so, he is entitled to continued occupancy of the apartment (at least until summary proceedings are had) and/or treble damages.
RPAPL 713 provides that:
“A special proceeding may be maintained under this article after a ten-day notice to quit has been served upon the respondent in the manner prescribed in section 735, upon the following grounds * * *
“10. The person in possession has entered the property or remains in possession by force * * * and he or his predecessor in interest was not in quiet possession for three years before the time of the forcible * * * entry or detainer and the petitioner was peaceably in actual possession at the time of the forcible * * * entry or in constructive possession at the time of the forcible * * * detainer; no notice to quit shall be required in order to maintain a proceeding under this subdivision.”
RPAPL 853 states: “If a person is disseized, ejected, or put out of real property in a forcible * * * manner, or, after he has been put out, is held and kept out by force or by putting him in fear of personal violence * * * he is entitled to recover treble damages in an action therefor against the wrongdoer.”
For RPAPL 713 (subd 10) to apply the statutory language requires that the person who has entered the property was not in quiet possession for three years before the time of the forcible entry or detainer. This court has found *504 that Ms. Simpson was in actual quiet possession since 1969. Ms. Simpson has been in quiet possession for far more than three years. She is then not in the class of people to which RPAPL 713 (subd 10) applies. (Galligan v Nembach, 121 NYS2d 443.)
Moreover, an action under RPAPL 713 (subd 10) must be based on a showing that the party was peaceably in actual or constructive possession at the time of the forcible or unlawful entry. (2 Rasch, NY Landlord & Tenant, Summary Proceedings, § 1167, March, 1984 Cum Supp, p 79; Wassberg v Orwell Mgt., NYLJ, Dec. 17, 1979, p 12, col 4 [App Term, 1st Dept]; Gulish v Johnston, 206 App Div 625.) By stating that a party must be in peaceful possession, the Legislature clearly intended that more than mere possession was necessary.
Under RPAPL 853 this court holds it is implied that a party must be in peaceful possession. This implication is derived from the language of the statute inasmuch as it speaks to a person being disseized, ejected or put out in an unlawful manner. Further substantiating this court’s interpretation of the requirement of peaceful possession is the derivation of RPAPL 853 from the former statute, section 535 of the Real Property Law. Peaceful possession was an element in the prior statute (Gulish v Johnston, 206 App Div 625, supra; Hennig v Goldberg, 188 Misc 609).
In the case of Hennig v Goldberg (188 Misc 609, 611, supra), the court reasoned as follows: “plaintiff was not even a guest of defendants and in no sense did she have possession of any real property. One who is not in possession of real property is not ‘put out’ or ‘kept out’. Obviously section 535 of the Real Property Law was never intended to make it necessary for an innkeeper to resort to court proceedings (even to squatter proceedings) to remove from his inn, or from a room in his inn, one who came in without his permission, express or implied. This is simply a case in which defendants found plaintiff in a room in which she did not belong and changed the lock so that she could not again gain access to that room. In so doing defendants were within their strict legal right”.
Under these circumstances this court concludes that Mr. Fish was not in peaceful possession of the apartment at the *505 time Ms. Simpson changed the locks. (Gulish v Johnston, supra; Hennig v Goldberg, supra.) His possession was unlawful, contested and anything but peaceful. Mr. Fish is not of the class of persons the Legislature meant to protect under RPAPL 713 (subd 10) and 853.
If this court were to hold that Mr. Fish was entitled to invoke these statutes we would be condoning Mr. Fish’s criminal actions with regard to the subject apartment. In effect this court would be an accessory to Mr. Fish’s crimes against Ms. Simpson. To interpret the statutes in the manner suggested by counsel for Mr. Fish would place this court’s seal of approval upon the occupancy of apartments by criminal and/or forceful means or by fraud or subterfuge. This policy would condone the use of force by outsiders while denying the rightful owner the ability to even change the locks for fear of civil sanctions. The only remedy for the rightful occupant would be long and costly court proceedings. This would give rights to the criminal not possessed by the lawful tenant.
There exists a common-law right to protect one’s property. “[0]ne who has no legal right to possession, cannot by force, or surreptitiously, acquire possession, and then set it up as a prima facie right, against the owner upon whose possession he has thus entered.” (Wood v Phillips, 43 NY 152, 157.)
In the area of criminal law the innocent have the right to use physical force to prevent damage to their property in the event of a burglary or larceny. One is justified to use physical force in those circumstances if he or she reasonably believes it to be necessary. (See Penal Law, §§ 35.20, 35.25.) It is possible that in the area of civil law the Legislature has provided that the victim of a crime is defenseless when the same Legislature has seen fit to provide the same person the defense of justification in the criminal statute?
Under the facts of this case, this court holds that since Mr. Fish did not have any right to possession of the apartment, the real occupant was entitled to use self-help and change the lock on the entrance door. Ms. Simpson was justified in her actions in order to bring an end to Mr. Fish’s criminal possession of the apartment. This court *506 feels impelled to so hold in light of Mr. Fish’s conduct. In these times of tight housing and criminal lawlessness, a tenant like anyone else must have the right to protect herself and her property provided the means are reasonable.
The usual forcible detainer case involves a landlord and a tenant. In the present case the parties are a tenant and another person who is not asserting a permanent claim to the tenant’s apartment, only a claim arising from the alleged lockout. Here the laws made for the protection of helpless indigent persons against their very powerful landlords are being used in a situation probably never foreseen by their enactors. Remedial legislation of this type must not become a club to be used on the average, unknowing and unwary citizen. To do so is a misuse. A person seeking to protect his property from a criminal act should not conceive that he could be liable in treble damages to the person who broke into his apartment.
Counsel for petitioner argues that section D16-1.01 et seq. of the Administrative Code confers rights on petitioner. It is alleged that this section provides justification for the infamous order to show cause depriving Ms. Simpson of the possession of her apartment without due process of law. This court holds that Mr. Fish can derive no rights under subdivision a of section D16-1.01 because that statute requires him to have been lawfully in possession. His time at the apartment, if it can be called possession, can by no means be termed lawful. Further, subdivision b of section D16-1.01 only applies to the owner of a multiple dwelling which Ms. Simpson is not. Finally, section D161.04 relegates the power to civilly enforce the provisions to the Corporation Counsel which neither Mr. Fish nor his attorney is. The provision gives the city the power to apply for a temporary restraining order, preliminary injunction or such other relief as may be appropriate. This court does not interpret it as condoning the deprivation of property without due process of law.
The equities in this case would point to the same result as we have already reached after reviewing both the common law and the statutory law. It is said that one should not profit from the results of his own bad acts. Here, Mr. *507 Fish illegally and fraudulently gained access to an apartment he had no right to enter. Ms. Simpson, although infinitely naive, or a “sucker” as she labeled herself, for not immediately calling the police was an innocent party of Mr. Fish’s manipulations.
The repairs he made to the apartment were done to remedy damage he caused and to make amends for his own bad and destructive acts or to further connive and manipulate Ms. Simpson into paying him or allowing him to stay. To allow him to gain any rights in the apartment would be a reward for his bad acts. This, the court will not do.
Petitioner’s counsel asserts that Mr. Fish became a licensee of Ms. Simpson. This court finds that petitioner has not met his burden of proof on that issue. License is defined as: “ "A license is a mere privilege or permission given by the owner of land authorizing another to enter and to use or occupy the land or part of it for any special purpose’ (Walsh on Law of Property [2d ed.], § 150.)” (Kaypar Corp. v Fosterport Realty Corp., 1 Misc 2d 469, 471, affd 272 App Div 878.)
The relationship here differs from a license in several important respects. There was no permission for Mr. Fish to enter the apartment, a license presupposes that authority. If it is contended that the license arose after he was in the apartment, this court found no such state of facts. There was no voluntary agreement for him to enter or to remain in the premises. Does a relationship based upon fraud, manipulation, subtle coercion and duress constitute a license? Ms. Simpson lacked the intent necessary to make an agreement. The testimony showed that Ms. Simpson agreed only that Mr. Fish have access to repair the damage he had caused. The only payment proven was to compensate Ms. Simpson for her property damage. There was no consideration and no rent paid. Hence this court concludes that no license was created.
Petitioner relies on the case of Yates v Kaplan (75 Misc 2d 259) for the proposition that in a wrongful detainer action a landlord will not be ordered to restore possession to a licensee but will be liable to him for treble damages. Yates is distinguishable from the present case on the basis of the lack of license and the criminal manner in which *508 petitioner obtained and retained possession. Here petitioner also abandoned the apartment prior to the alleged illegal eviction.
Were this court to have concluded that Mr. Fish was a licensee, the result would have been the same. As the order granting Mr. Fish possession deprived Ms. Simpson of her property without due process of law this court would remedy that order before the claims of Mr. Fish were considered. The wrong to Ms. Simpson assumes constitutional proportions. The prior order being improper this court would order that Ms. Simpson be restored to her apartment, vacating the prior order of this court. (CCA 212, 2102; CPLR 5105, 5523; D. U. Fourth Realty Co. v Meredith, 119 Misc 2d 423, 424, citing Leland House v Wigfall, 98 Misc 2d 355 [App Term, 1st Dept], affd 78 AD2d 783; 520 East 81st St. Assoc. v Heineman, NYLJ, May 17,1982, p 15, col 1 [App Term, 1st Dept]; Golde Clothes Shop v Leow’s Buffalo Theatres, 236 NY 465.) The order restoring Mr. Fish to the apartment having been fully complied with on its terms, this court is not bound by the strictures against overruling the order of a collateral court.
Thus, this court would have determined that Ms. Simpson is in constructive possession and even if Mr. Fish were a licensee he would not be entitled to be restored to possession (Yates v Kaplan, 75 Misc 2d 259, supra). This court would also have held that Mr. Fish would not be entitled to treble damages under RPAPL 853. One should not be allowed to profit from his own bad acts. Thus, Mr. Fish would only recover single damages, and Ms. Simpson the apartment.
Petitioner may be considered an employee or servant of Ms. Simpson for the purpose of making repairs. However, there are employees and employees. Here, he was given access to make repairs in mitigation of his own damages. His use of her apartment as a residence was as criminal as his entry.
The fact that Ms. Simpson sought to protect her own tenancy by applying to the landlord for permission to have a roommate does not inure to petitioner’s favor. It was credibly explained by her to be an attempt to protect her own interests when she found that she could not quickly *509 dislodge Mr. Fish from the apartment. This court credits her testimony on this subject. In any case Mr. Fish was not a party to the application and should neither be bound by it or be able to invoke it.
The fact that a notice to quit was served by Ms. Simpson’s attorney after commencement of the present proceeding is not an indication of what the relationship, if any, was in the fall of 1983. It was a reasonable attempt by Ms. Simpson’s counsel to protect her interests after Mr. Fish had been restored to the possession of the apartment by the court.
This court further holds that Mr. Fish is barred from the relief he seeks in his petition on the grounds of his abandonment of the premises in early December.
This court is aware of the modern policy against self-help evictions (Carter v Andriani, 84 AD2d 513 [dissent]). There are exceptions to this rule. An abandonment or surrender of the premises entitles an owner to enter the premises without a court proceeding (2 Rasch, NY Landlord & Tenant, Summary Proceedings, § 859 et seq.; Pine Hill Assoc. v Malveaux, 89 Misc 2d 234, revd 93 Misc 2d 63 [App Term, 2d Dept], reversing the lower court and upholding peaceful reentry by landlord if tenant has failed to pay rent and lease provides therefor). This decision was followed by the Appellate Division in Kepo, Inc. v Ramano (85 AD2d 621).
Ms. Simpson testified that in late November or early December, Mr. Fish stated that he would soon be going to his condominium in the west. Mr. Fish’s testimony on this subject was equivocal. The court finds that after making this statement in early December, Mr. Fish disappeared, leaving the apartment in disarray. Ms. Simpson testified that it looked as if a garbage truck had unloaded there. After waiting five days and visiting the apartment several times, Ms. Simpson concluded that Mr. Fish had indeed gone out west. This conclusion was further supported by the fact that the phone had been disconnected and the utilities were unpaid. She cleaned the apartment and on December 22, 1983 had the locks changed. Based on these facts, this court finds that Ms. Simpson acted reasonably in assuming that Mr. Fish abandoned the apartment in the beginning of December.
*510 Mr. Fish was actually in Bellevue Hospital, the result of the above-mentioned assault and property damage, allegedly caused during a manic depressive episode. The credible testimony showed that Mr. Fish failed to contact Ms. Simpson until February, 1984, despite the fact that he was released from Bellevue in the beginning of January. This court infers from this an intent to abandon, or that petitioner is guilty of laches (Galligan v Nembach, 121 NYS2d 443, supra). Even his wife’s phone call reflected only an intent to reclaim some of his possessions, not the apartment.
Mr. Fish’s testimony that he stayed at the apartment on or about January 13, 1984 is untrue. Not only was Mr. Fish’s credibility completely impeached but the clear and convincing evidence shows that the lock on the apartment door was changed on December 22, 1983. It would have been impossible for him to have gained access on January 13, using his wife’s set of keys.
Under the totality of the circumstances, the court holds that Mr. Fish abandoned any interest that he had in the premises in the beginning of December. Ms. Simpson was reasonable in acting after Mr. Fish’s abandonment by reentering and asserting dominion over the premises. The premises having been abandoned, Mr. Fish may not assert an action for forcible entry and detainer. He lacked “actual or constructive possession” of the premises. (RPAPL 713, subd 10; 853.)
This court has concluded that Mr. Fish does not have any right to possession or occupancy of the premises. Nevertheless, the fact is that Mr. Fish was placed in possession by the prior order of this court. Petitioner while maintaining his rights herein, concedes that Ms. Simpson’s right to possession is paramount to his and that she will eventually obtain possession through court proceedings. He complains here only of the method by which she obtained possession in December.
This court has the power to order restitution of Ms. Simpson to her apartment from which she was wrongfully separated by an order of thiá court. (D. U. Fourth Realty Co. v Meredith, 119 Misc 2d 423, supra, citing Leland House v Wigfall, 98 Misc 2d 355, affd 78 AD2d 783, supra; *511 520 East 81st St. Assoc. v Heineman, NYLJ, May 17,1982, p 15, col 1, supra; Golde Clothes Shop v Loew’s Buffalo Theatres, 236 NY 465, supra.)
In view of my decision in the present case, this court orders Mr. Fish to immediately restore Ms. Simpson to possession and grants her a judgment of possession, no stay. This decision is without prejudice to Mr. Fish’s right to pursue his remedy at law for any alleged repairs he has made to the apartment, whether as a contractor, employee or other.