OPINION OF THE COURT
Marshall C. Berger, J.
Petitioner, Friends of Yelverton, Inc., operates the Yelverton School, a kindergarten-elementary school along with a day care center and adult education center (Yelverton). It brings this summary proceeding to be restored to possession of the space it formerly utilized at the Morrisania Multi-Service Center (Center), 1180 Rev. James A Polite Avenue in The Bronx, a building owned by New York City and operated by the Human Resources Agency (HRA) under the Federal neighborhood facilities program (42 USC § 3103).
The respondents are the city and the 163rd Street Improvement Council (Council), a neighborhood group which has contracted with HRA to operate and service the Center subject to the extensive retained authority of HRA. The Council in turn entered into an occupancy agreement with Yelverton to let it use the left wing of the Center as a school during certain prescribed hours from Monday to Saturday from January 16, 1984 to August 31, 1984. Although the occupancy agreement by its terms would "not become effective” without prior written HRA approval and HRA never formally approved that agreement, Yelverton in fact used the premises until the end of the 1985-1986 school year with HRA’s knowledge and acquiescence. Both the agreement between HRA and the Council and the occupancy agreement appear to be city-prepared forms presumably used in all city-run neighborhood facilities under the Federal program with a minimum of *277 typed-in blanks and no apparent input from either Yelverton or the Council.
Yelverton paid some of the "fair share fees” imposed by the occupancy agreement but soon fell behind in its payments. The Council instituted a conventional nonpayment summary proceeding in this court in May 1985 denominating the unpaid balance of fair share fees as rent. The proceeding was settled by a stipulation whereby Yelverton agreed to a final judgment for $18,872.14, paid $5,000 down and agreed to pay the balance of $13,872.14 in installments through December 31, 1985. The warrant was stayed until that date but the Council was given the right to execute the warrant upon five days’ notice if Yelverton failed to make any of the stipulated payments. While Yelverton seeks to vacate the stipulation, it does not indicate any defense to the proceeding and hence the request will not be granted. While Yelverton failed to make such payments, the Council has done nothing further in that proceeding.
In February 1986 HRA wrote Yelverton demanding it cease operations at the Center. In early August while Yelverton was in summer recess, HRA and the Corporation Counsel met with representatives of the Council and stated the city would change the locks for the premises utilized by Yelverton. The Council wrote Yelverton informing it of this. At the same time, the city instituted a plenary action against Yelverton in trespass in Supreme Court, New York County. The institution of this action is astonishing both because the city ignored the more appropriate and expeditious summary proceeding and because the action was not brought in The Bronx, the location of the premises at issue.
When some Yelverton staff members came to the premises on August 14 to prepare for the fall term, they found the locks changed. Apparently, since then the former Yelverton space has been given as expansion space to another organization which had utilized other portions of the Center. Shortly after its discovery, Yelverton moved by order to show cause in the Council’s nonpayment proceeding seeking possession. After an evidentiary hearing on September 5, 1986, I denied the motion since it was the city who had changed the locks rather than the Council and the city was not joined, without prejudice to a new motion in which the city would be a party. Thereafter, Yelverton instituted this proceeding against both the city and Council and made in it a new motion for possession.
*278 THE LEGALITY OF THE CITY’S LOCKOUT
The first issue is whether the city’s lockout was legally permissible. Simply put there was no justification for it either in fact or law. The city has never been able to explain why it felt compelled to resort to self-help rather than any of the variety of legal process available to it. It could have instituted a holdover proceeding based on the expiration of the occupancy agreement and its asserted claim of illegality. It could have had the Council use the stipulation in the nonpay proceeding and Yelverton’s default under it to obtain a warrant of eviction. And yet, the city turned its back on legal process and instead resorted to what proved to be an illegal and indeed unconstitutional lockout. It was an action unworthy of the city which routinely refuses to evict squatters on vacant lots except through meticulous adherence to the prescribed statutory procedures. The only explanation the city could muster was that it carefully considered the matter before its ill-advised action.
The illegality of the city’s action is, however, clear. The whole purpose of the statutory summary proceeding (RPAPL art 7) is as the legal and peaceable alternative to self-help (Velezquez v Thompson, 451 F2d 202, 204 [2d Cir 1971]; Matter of Tri-State Refreshments v Nitke, 41 Misc 2d 386, 390 [Broome County Ct 1964]). The limitation on the right to evict by self-help was tightened when RPAPL 713 (10) and 853 were amended to have a proceeding for forcible entry and detainer cover eviction by "unlawful means” as well as "force” (Maracina v Shirrmeister, 105 AD2d 672 [1st Dept 1984]). Contrary to the city’s assertions, forcible entry and detainer is not restricted to situations involving a landlord-tenant relationship (Markun v Weckstein, 100 Misc 668 [App Term, 1st Dept 1917]; 2 Rasch, New York Landlord & Tenant — Summary Proceedings § 1168, at 600).
Yelverton at the least is a licensee; a party given permission to do a series of acts upon the property of another without any estate in the property (Lo Russo v Great 110, 59 Misc 2d 40, 41 [Dist Ct, Suffolk County 1969]; 1 Rasch, New York Landlord & Tenant — Summary Proceedings § 71, at 95-96). Yelverton had the right to run a school at the Center the way such typical licensees as the operator of a department in a retail store or a laundry room concession in an apartment house are given the right to use the property of another. The city’s action thus deprived Yelverton of its licensee rights *279 unilaterally without resort to legal process. Incidentally, the Council’s apparently erroneous characterization of Yelverton’s status in its nonpay proceeding can no more change the real character of that status as the erroneous use of lease words in an agreement can upgrade a licensee into a tenant (Kaypar Corp. v Fosterpart Realty Corp., 1 Misc 2d 469 [Sup Ct, Bronx County], affd 272 App Div 878 [1st Dept 1947]).
Yates v Kaplan (75 Misc 2d 259 [Civ Ct, NY County 1973, Younger, J.]) held that the housekeeper of a deceased tenant, although only a licensee, was wrongfully evicted when the landlord kept her out by changing the locks in her temporary absence. The correctness of that. decision, where the person evicted had a far briefer licensee status than Yelverton and without the landlord’s acquiescence in it, is manifest when the problem is examined in a constitutional context. Beginning with Sniadach v Family Fin. Corp. (395 US 337 [1969]) the courts have scrutinized any taking of property without judicial examination as a possible deprivation of due process. Justice Potter Stewart in striking down the Pennsylvania and Florida replevin statutes in Fuentes v Shevin (407 US 67 [1972]) enunciated the rationale for such cases with his characteristic cogency. Of particular relevance is his rejection of the argument that the statutes were saved by their requirements of a bond.
"But those requirements are hardly a substitute for a prior hearing, for they test no more than the strength of the applicant’s own belief in his rights. Since his private gain is at stake, the danger is all too great that his confidence in his cause will be misplaced. Lawyers and judges are familiar with the phenomenon of a party mistakenly but firmly convinced that his view of the facts and law will prevail, and therefore quite willing to risk the costs of litigation. Because of the understandable, self-interested fallibility of litigants, a court does not decide a dispute until it has had an opportunity to hear both sides — and does not generally take even tentative action until it has itself examined the support for the plaintiffs position * * *
"The minimal deterrent effect of a bond requirement is, in a practical sense, no substitute for an informed evaluation by a neutral official. More specifically, as a matter of constitutional principle, it is no replacement for the right to a prior hearing that is the only truly effective safeguard against arbitrary deprivation of property.” (407 US, supra, at 83.)
*280 Likewise in point is Justice Stewart’s discussion of why the merits of the underlying disputes over personal property sold under a conditional sales contract are irrelevant: "But even assuming that the appellants had fallen behind in their installment payments, and that they had no other valid defenses, that is immaterial here. The right to be heard does not depend upon an advance showing that one will surely prevail at the hearing. 'To one who protests against the taking of his property without due process of law, it is no answer to say that in his particular case due process of law would have led to the same result because he had no adequate defense upon the merits.’ Coe v. Armour Fertilizer Works, 237 U. S. 413, 424. It is enough to invoke the procedural safeguards of the Fourteenth Amendment that a significant property interest is at stake, whatever the ultimate outcome of a hearing on the contractual right to continued possession and use of the goods” (supra, at 87).
These quotes answer the city’s contention that it was privileged to unilaterally evict Yelverton because of the strength of its case and its good-faith belief in it.
Although the United States Supreme Court did not apply the Sniadach-Fuentes principles to sales of seized chattels under statutory self-help remedies for recovery of disputed chattels because they did not involve State action (Flagg Bros, v Brooks, 436 US 149 [1978]), the New York Court of Appeals subsequently specifically held such self-help violated the New York State Constitution due process requirements of article I, § 6 (Sharrock v Dell Buick-Cadillac, 45 NY2d 152, 160 [1978]). The court pointed out the State Constitution in contrast to the Fourteenth Amendment prohibits any deprivation of life, liberty or property without due process of law not just such deprivation by the State. Consequently, New York applies, e.g., "a more flexible State involvement requirement” (at 160). Of course, in any event the city itself is directly covered by the Fourteenth Amendment and is held to a higher standard than the private landholder.
Applying Sniadach-Fuentes-Sharrock principles, in the absence of an " 'extraordinary situation’ ” which "must be truly unusual” (Fuentes v Shevin, supra, at 90), self-help evictions without judicial sanction of any substantial property interst must be avoided. This result is reached whether these cases are referred as constitutional mandates or as formulations of sound policy which apply to interpretation of State law.
*281 The city cites only three cases to justify its action. De Villar v City of New York (628 F Supp 80 [US Dist Ct, SD NY 1986]) holds it was permissible under the Federal Constitution for the city to use self-help to evict trespassing squatters and former superintendents whose property rights had ended with their employment. It made no determination of whether this rule applied to a licensee, particularly one who the city had previously tolerated for 2Vi years. Likewise it made no ruling on what State constitutional and statutory law required. Bliss v Johnson (73 NY 529 [1878]) is an old case long antedating both the modern forcible entry and detainer statute and Sniadach (supra) and its Federal and State progeny. Fish v Simpson (124 Misc 2d 496 [Civ Ct, NY County 1984]) is as it points out a unique case. In a phrase, the person evicted by self-help was a trespasser by false pretenses and hence it has no applicability to the eviction of a long-tolerated licensee.
The city also cites section 231 (1) of the Real Property Law. That does afford a landlord the right to evict by self-help a tenant using the premises "for any illegal trade, manufacture or other business”. But under the principles discussed above, that statute should be used sparingly. It should not be used in situations not involving such Penal Law violations directly related to the premises as prostitution, gambling or narcotics or in the absence of either urgent need for haste or conclusive proof of illegality such as a penal conviction. This is particularly so since RPAPL 711 (5) already affords a landlord the most summary of summary proceedings without the need for any preproceeding notices or demands for just such use of premises for illegal purposes.
Moreover, the city’s allegations of illegality appear to be makeweights. Although Yelverton has failed to have its incorporation approved by the Board of Regents in violation of section 216 of the Education Law, enforcement of that statute revolving around Yelverton’s form of organization does not justify precipitous action. While the city also contends that Yelverton’s day care center has not been approved by the city’s Department of Health, any other day care cénter in the Center including the organization now occupying Yelverton’s space would have a similar problem.
THE REMEDY
Holding the city acted illegally does not mean it must restore the premises to Yelverton. Yates v Kaplan (supra) and *282 Bressler v Amsterdam Operating Corp. (194 Misc 76 [Mun Ct, NY County 1949]) hold that a court need not order a wrongfully evicted party back to possession where the return would be futile. Ignoring the charges of illegality, at best Yelverton is a licensee whose alleged written right to use the premises has expired and whatever holdover rights it might have enjoyed have been terminated. It makes no sense to restore Yelverton to possession only to order its eviction a month or so hence.
However, as in Yates (supra), the forcible entry and detainer remain. Accordingly, the case is restored to the Part 18 Calendar for a hearing on Yelverton’s damages for November 18, 1986.