John CARTER, John Swing and
John Veronis, Plaintiffs,

v.

HELMSLEY–SPEAR, INC. and 474431
Associates, Defendants.

No. 94 Civ. 2922 (DNE).

United States District Court,
S.D. New York.

Aug. 31, 1994.

Richard A. Altman, and Hughes Hubbard & Reed, New York City (Charles Lozow, Daniel H. Weiner, John J. McGreevy, Patrick T. Perkins, of counsel), for plaintiffs.

Davidoff & Malito, New York City (Matthew Feigenbaum, Adrian Zuckerman, Robert C. Boneberg, Jill Rosenthal, John Harris, of counsel), for defendants.

## OPINION & ORDER

EDELSTEIN, District Judge:

Plaintiffs bring this action to prevent the alteration or destruction of certain art work installed by them in the lobby of a commercial building located in Queens, New York,

and to recover money damages, costs, and attorney's fees. Plaintiffs' first claim seeks relief pursuant to the Visual Artists Rights Act of 1990. This claim raises a number of issues of first impression. Plaintiffs' complaint, as amended by the Joint Pretrial Order ("JPTO")[1] (JPTO, at ¶ 1), also alleges willful infringement of copyright, and raises two supplemental state law claims, tortious interference with contract and unlawful ejection. Defendants raise a single counterclaim alleging waste.

On or around April 21, 1994, plaintiffs brought an order to show cause seeking a temporary restraining order to, among other things, prevent defendants from taking any action to alter, deface, modify, or mutilate plaintiffs' sculptures and installations located at 47–44 31st Street, Queens, New York. On April 25, 1994, this Court heard argument from both plaintiffs and defendants regarding plaintiffs' application for a temporary restraining order. On April 26, 1994, this Court issued a temporary restraining order enjoining defendants from (a) taking any action to alter, deface, modify, or mutilate plaintiffs' sculptures and installations located at 47–44 31st Street, Queens, New York; and (b) denying plaintiffs access to 47–44 31st Street, Queens, New York, Monday through Friday, between the hours of 12:00 p.m. and 5:00 p.m.[2]

On May 5, 1994, this Court commenced a hearing ("the preliminary injunction hearing") on plaintiffs' motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure ("Rule") 65. Plaintiffs sought an order enjoining defendants, during the pendency of this action, from "(a) taking any action to alter, deface, modify or mutilate plaintiffs' sculptures and installations located at 47–44 31st Street, Queens, New York; (b) taking any action to breach the agreements heretofore entered into between plaintiffs, Sig Management Company and 47–44 31st

Association, L.P.; and (c) denying plaintiffs, their employees and invitees such access to the Property as had been enjoyed by them heretofore."

During the course of the preliminary injunction hearing, which commenced on May 5, 1994 and continued through May 13, 1994, this Court heard oral argument and received documentary evidence in support of, and in opposition to, plaintiffs' motion for a preliminary injunction. In addition, plaintiffs and defendants called both expert and fact witnesses. Pursuant to Rule 65(a)(2), all evidence received, and testimony adduced, at the preliminary injunction hearing is part of the record on the trial of this action.

On May 18, 1994, this Court filed an Opinion & Order, *see Carter v. Helmsley–Spear, Inc.*, 852 F.Supp. 228 (S.D.N.Y.1994) ("May 18 Opinion"), granting in part and denying in part plaintiffs' motion for a preliminary injunction. In the May 18 Opinion, this Court ordered, *inter alia*, that "during the pendency of this action, defendants, their employees, and agents, are enjoined from (a) taking any action to alter, deface, modify, or mutilate plaintiffs' sculptures and installations located at 47–44 31st Street, Queens, New York; and (b) denying plaintiffs and their invitees access, between the hours of 9:00 a.m. and 5:00 p.m. Monday through Friday, ·to the Lobby of 47–44 31st Street, Queens, New York for the purpose of viewing, photographing, or videotaping the Work." *Id.* at 239.

This Court tried this action without a jury over several days in June and July of this year. Plaintiffs and defendants each called both fact and expert witnesses, and offered into evidence portions of depositions and documentary evidence. Pursuant to Rule 52, this Opinion shall constitute the Court's written findings of fact and conclusions of law.

---

**1.** Upon request of the parties, the Joint Pretrial Order was twice amended. *See Carter v. Helmsley–Spear, Inc.*, 94 Civ. 2922 (DNE) (June 28, 1994 Memorandum Endorsement); *Carter v. Helmsley–Spear, Inc.*, 94 Civ. 2922 (DNE) (July 7, 1994 Memorandum Endorsement).

**2.** On April 27, 1994, this Court received cross-requests from plaintiffs and defendants to modify

the temporary restraining order issued by this Court on April 26, 1994. In a Memorandum & Order, dated April 28, 1994, this Court denied both plaintiffs' and defendants' requests for modification. *See Carter v. Helmsley–Spear, Inc.*, 94 Civ. 2922 (DNE), 1994 WL 167960, 1994 U.S. Dist. LEXIS 5581 (S.D.N.Y. April 28, 1994).

*BACKGROUND*

Plaintiff John Meade Swing is a sculptor and an artist who has held public exhibitions of his original works of art since 1984. (HTr.[3], at 18–19; UF[4] 1). Mr. Swing is also licensed by the City of New York as a structural steel welder. (HTr., at 21; UF 1). Plaintiff John James Veronis, Jr. is an artist and a sculptor who supports himself through his artistic endeavors. (HTr., at 30; UF 2). Plaintiff John Francis Carter also is a professional artist and sculptor. (HTr., at 37, 39; UF 3). Plaintiffs work as partners to create sculptures and other works of art. Collectively, plaintiffs are known as the "Three–Js," or "Jx3." (HTr., at 60; UF 4).

Defendant 474431 Associates ("Associates") is the owner of a building located at 47–44 31st Street, Queens, New York ("the Property"). Associates has owned the Property since June 1978. (UF 5). The General Partners of Associates are Alvin Schwartz and Supervisory Management Corp. (UF 5). All of the shares of Supervisory Management Corp. are owned by Helmsley Enterprises, Inc. (UF 5). Defendant Helmsley–Spear, Inc. became the managing agent of the Property for its disclosed principal, Associates, on April 6, 1994. (UF 6). Alvin Schwartz is, and during all periods of time relevant to this action has been, an employee of Helmsley–Spear, Inc. (UF 6). Thomas Schwartz is, and during all periods of time relevant to this action has been, an employee and officer of Helmsley–Spear, Inc. (UF 6; TTr., at 222).

On February 1, 1990, 47–44 31st Street Associates, L.P. ("the Limited Partnership") entered into a net lease agreement ("the Net Lease") with Associates to lease the Property. (JPTO, at ¶ 5(d); DExh.[5] BBB). From February 1, 1990 until June 1993, Irvin Cohen, or an entity controlled by him, was the general partner of the Limited Partnership. (UF 9). During this period, Corporate Life Insurance Company ("Corporate Life") was a limited partner in the Limited Partnership. (UF 10). From February 1, 1990 to June 1993, Sig Management Company ("Sig") was the managing agent of the Property for the Limited Partnership. (UF 16). Mr. Cohen controlled Sig and personally was responsible for managing the Property on behalf of Sig and the Limited Partnership from February 1, 1990 until June 1993. (UF 16).

By an agreement dated December 16, 1991 ("the Contract"), plaintiffs contracted with Sig "to design, create and install sculpture and other permanent installations" in the lobby ("the Lobby") and other areas of a building located at 47–44 31st Street, Queens, New York. (DExh. NN; UF 21–27). Under the terms of the Contract, Sig granted plaintiffs "full authority in design, color and style" of the art work to be installed, but retained the authority to direct the location of the installations within the confines of the Property. The Contract provides that plaintiffs are entitled to "receive design credit" for their sculptures and installations and own the copyright to the these sculptures and installations. (DExh. NN; UF 26). Sig was to receive fifty percent of any proceeds earned from the exploitation of this copyright. (DExh. NN). On January 20, 1993, Sig and plaintiffs signed an agreement that extended the duration of the Contract, without material alteration, for an additional year. (DExh. OO).

In or around June 1993, Corporate Life became the general partner of the Limited Partnership. (UF 12). From June 1993 until April 6, 1994 Corporate Life acted as managing agent for the Property and Theodore Nearing of Corporate Life assumed Mr. Cohen's responsibility for managing the Property. (UF 17). In July 1993, the Limited Partnership assumed the Contract, as extended. (UF 116).

On December 29, 1993, Mr. Nearing transmitted a letter to plaintiffs that, with the exception of discontinuing the provision of certain benefits, once again extended the

---

**3.** "HTr." refers to the hearing transcript. "TTr." refers to the trial transcript.

**4.** "UF" refers to a fact stipulated to by the parties in the Joint Pretrial Order. The number following the designation "UF" identifies the lo-

cation of the stipulated fact within paragraph five of the Joint Pretrial Order.

**5.** "DExh." refers to exhibits moved into evidence by defendants. "PExh." refers to exhibits moved into evidence by plaintiffs.

Contract without material alteration. (DExh. B; JPTO, at ¶ 5(h)).

Pursuant to the Contract and subsequent extensions thereof, plaintiffs were each paid $1,000 weekly by Sig from December 1991 until July 1993. (HTr., at 27; UF 29, 30). From July 1993 until April 6, 1994, plaintiffs were each paid $1,000 weekly by the Limited Partnership. (HTr., at 28; UF 31, 32). Throughout this period, plaintiffs continually created art work·in the Lobby. (HTr., at 34).

The Net Lease was terminated on March 31, 1994 (UF 19), and the Limited Partnership filed for protection under Chapter 7 of the United States Bankruptcy Code on April 8, 1994 (UF 14). On April 7, 1994, defendants' agents ordered plaintiffs to leave the Property and told plaintiffs that they would be deemed trespassers if plaintiffs subsequently returned to the Property. (UF 109; TTr., at 245–46). At this time, defendants' agents also made certain statements that led plaintiffs to believe that defendants intended to alter or remove the art work installed in the Lobby. Thereafter, this action commenced.

## DISCUSSION

### I. PLAINTIFFS' FIRST CLAIM FOR RELIEF: THE VISUAL ARTISTS RIGHTS ACT OF 1990

■ Plaintiffs' first claim for relief is based upon the Visual Artists Rights Act of 1990 ("VARA"), 17 U.S.C. § 101 et seq. (JPTO, at ¶ 4(a)(1)). VARA amends the Copyright Act. In passing VARA, Congress for the first time provided for protection of artists' "moral rights" under the Copyright Act. See Jane C. Ginsburg, Copyright in the 101st Congress: Commentary on the Visual Artists Rights Act and the Architectural Works Copyright Protection Act of 1990, 14 Colum.–VLA J.L. & Arts 477, 478 (1990) [hereinafter "Ginsburg"]. "[M]oral rights afford protection for the author's personal, non-economic interests in receiving attribution for her work, and in preserving the work in the form in which it was created, even after its sale or licensing." Id. (footnote omitted); see William F. Patry, Copyright

Law and Practice, Ch. 14, at 1021; see also H.R.Rep. No. 101–514, 101st Cong., 2d Sess. 5, reprinted in, 1990 U.S.C.C.A.N. at 6915.

17 U.S.C. § 106A(a)(3) provides that the author of a work of visual art,

subject to the limitations set forth in section 113(d), shall have the right—

(A) to prevent any intentional distortion, mutilation, or other modification of that work which would be prejudicial to his or her honor or reputation, and any intentional distortion, mutilation, or modification of that work is a violation of that right, and

(B) to prevent any destruction of a work of recognized stature, and any intentional or grossly negligent destruction of that work is a violation of that right.

A "work of visual art" is defined to include paintings, drawings, prints, and sculptures, existing in a single copy or in limited edition. 17 U.S.C. § 101. Works made for hire, works of applied art, and works not otherwise subject to copyright protection such as strictly utilitarian objects, are excluded from this definition. Id. The rights delineated in 17 U.S.C. § 106A(a)(3) subsist for the life of the last surviving author of a work created by more than one artist. 17 U.S.C. § 106A(d)(3).

The limitations set forth in 17 U.S.C. § 113(d), which are referenced in 17 U.S.C. § 106A(a)(3), are as follows:

(d)(1) In a case in which—

(A) a work of visual art has been incorporated in or made part of a building in such a way that removing the work from the building will cause the destruction, distortion, mutilation, or other modification of the work as described in section 106A(a)(3), and

(B) the author consented to the installation of the work in the building either before the effective date . . . of the Visual Artists Rights Act of 1990, or in a written instrument executed on or after such effective date that is signed by the owner of the building and the author and that specifies that installation of the work may subject the work to destruc-

tion, distortion, mutilation, or other modification, by reason of its removal,

then the rights conferred by paragraphs (2) and (3) of section 106A(a) shall not apply.

(2) If the owner of a building wishes to remove a work of visual art which is a part of such building and which can be removed from the building without the destruction, distortion, mutilation, or other modification of the work as described in section 106A(a)(3), the author's rights under paragraphs (2) and (3) of section 106A(a) shall apply unless—

(A) the owner has made a diligent, good faith attempt without success to notify the author of the owner's intended action affecting the work of visual art, or

(B) the owner did provide such notice in writing and the person so notified failed, within 90 days after receiving such notice, either to remove the work or to pay for its removal.

### A. "Work of Visual Art"

#### i. Evaluation of Whether Plaintiffs' Art Work is a Single Work of Art or Several Works of Art

■ The first question that must be examined is whether plaintiffs' sculptural installations in the Lobby[6] constitute a single work of art or instead are several discreet works of art that must be treated separately under VARA. The art work in the Lobby consists of a number of sculptural elements including art work attached to the ceiling and the floor, interactive art, a vast mosaic covering the majority of the floor of the Lobby and portions of walls and several sculptural elements, and the interior of three elevators that open into the Lobby. For the reasons discussed below, I find that, with the exception of certain items described below, the art work in the Lobby is a single work of art whose elements are interrelated ("the Work").

Plaintiffs consider the Work to be a single work of art. (TTr., at 116, 147). At the preliminary injunction hearing, Mr. Carter testified that "all of these pieces are interrelated and to remove one contaminates the meaning of the whole piece. It would be like removing part of a painting or the hands from a portrait because we consider this to be one work." (HTr., at 60). Although he obviously has an interest in the outcome of this litigation, I found Mr. Carter to be a credible and sincere witness and I credit this testimony. Mr. Carter's testimony was bolstered by the testimony of the other plaintiffs and by that of expert witnesses called by plaintiffs. For example, plaintiffs called Professor Aedwyn Darroll to testify as an expert in sculpture and other visual art. Professor Darroll has taught two- and three-dimensional design (including sculpture) for more than twenty years (TTr., at 180) and currently teaches at the Parson School of Design and at the Fashion Institute of Technology in New York City (TTr., at 180–81). Professor Darroll testified that the elements of the Work are interrelated. (TTr., at 184–85). I found Professor Darroll to be a well-qualified and credible witness.

In addition, the method by which plaintiffs created the Work supports a finding that the Work is a single work of art. Before a sculptural element was built and installed, plaintiffs conferred to determine whether it would "work well" with the other elements. (TTr., at 114). According to plaintiffs, each sculptural element was "determined very much by the element that [came] before it and these things mesh together." (TTr., at 161).

Other evidence adduced at the preliminary injunction hearing and during the trial also supports plaintiffs' contention that the Work is a single work of art and that the various sculptural elements are interrelated. The Work is composed of several sculptural and other elements that appear to form an integrated whole. (HTr., at 52–83; PExh. 7, 8–31). For example, tile is attached to the floor and walls to form a vast mosaic. This mosaic is interrelated with sculptural elements that adorn the floor, walls, and ceiling

---

**6.** Although plaintiffs created art work in areas of the Property other than the Lobby, protection of that art work is not at issue in this case. Accordingly, only the art work located in and around the Lobby will be discussed.

of the Lobby. (*See, e.g.,* HTr., at 55, 63, 79; PExh. 7, 23). The mosaic contains words and phrases that correspond to sculptural elements located on the ceiling and walls. (*See, e.g.,* HTr., at 57; PExh. 7). Several interactive pieces depend for their meaning on neighboring sculptural elements, as well as on phrases and representations depicted in the mosaic tile. (*See, e.g.,* HTr., at 57–58; 62–64). In sum, the various sculptural elements appear to be interrelated—rather than distinct works of art that could be separated from the remainder of the Work without losing their meaning.

The Work is also thematically consistent. A primary motif of the Work is recycling. Most of the materials used to make the Work are themselves recycled matter: the floor and wall mosaic is composed of tiles manufactured from recycled glass; most of the sculptural elements are built from discarded objects;[7] and other sculptural elements were created from objects previously owned by tenants of the Property and given to plaintiffs. Various representations, including a statement incorporated in the floor mosaic, "DO YOU REMEMBER WATER," which flows from a depiction of a giant mouth surrounding an elevator, attempt to highlight the negative societal impact of the failure to recycle. A similar example of this is found on the ceiling: Plaintiffs have crafted and hung various sculptural elements that represent "space junk." Viewed in context this particular sculptural element portrays the danger of dumping refuse into space.

In sum, this Court heard testimony that the elements of the Work are interrelated, the Work appears to be interrelated, and the Work is thematically consistent. In addition, upon the request of the parties, this Court conducted an inspection of the art work in the Lobby on July 14, 1994. This Court's inspection of the art work supported evidence in the record that the Work is a single work of art. Accordingly, I credit plaintiffs' contention that the Work is a single work of art, and find that the Work must be considered as a single work of art.

Plaintiffs did not show, however, that several items described in the Joint Pretrial Order (JPTO, at ¶ 5(f)), the "building directory," the "entrance steps 31st Street entrance," and the ceiling and wall lighting (with the exception of lighting elements directly incorporated into the Work such as "the chandelier," "the florescent snake," the "illuminated floor placque," and lighting elements incorporated into various sculptural elements such as the headlights of the bus) are part of, or integrated in, the Work. Accordingly, these items will be discussed separately.

### ii. Applied Art

■ Defendants argue that the Work is not entitled to protection under VARA because it incorporates elements that they describe as "applied art." The term "applied art" describes two-and three-dimensional ornamentation or decoration that is affixed to otherwise utilitarian objects. *See, e.g., Kieselstein–Cord v. Accessories by Pearl, Inc.,* 632 F.2d 989, 997 (2d Cir.1980). Works of applied art are not "works of visual art" as defined by VARA, *see* 17 U.S.C. § 101, and therefore are not protected thereunder.

■ The Work is a single work of art. Even examined individually, however, the vast majority of the Work's sculptural elements cannot reasonably be described as applied art. Sculptural elements affixed to the ceiling, for example, serve absolutely no utilitarian purpose. These elements do not automatically become applied art merely because the ceiling to which they are attached is a utilitarian object. Such a result would render VARA nonsensical in light of the fact that VARA protects works of visual art that are permanently installed in buildings. Presumably, any part of a building to which such visual art is affixed serves some utilitarian purpose.

■ Moreover, nothing in VARA proscribes protection of works of visual art that incorporate elements of, rather than constitute, applied art. Indeed, the legislative his-

---

7. Although certain sculptural elements were constructed using new material, such as stock steel, these elements are thematically consistent because even these elements have the appearance of having been crafted from recycled material.

tory of VARA indicates that Congress intended that a work of art can be a "work of visual art" as defined by VARA even if it incorporates elements of applied art. *See* H.R.Rep. No. 101–514, 101st Cong., 2d Sess. 13–14, *reprinted in,* 1990 U.S.C.C.A.N. at 6923–24 ("[A] new and independent work created from snippets of these materials, such as a collage, is of course not excluded."). "The courts should use common sense and generally accepted standards of the artistic community in determining whether a particular work falls within the scope of the definition" of works of visual art. H.R.Rep. No. 101–514, 101st Cong., 2d Sess. 11 (1990), *reprinted in,* 1990 U.S.C.C.A.N. at 6921. While plaintiffs arguably may have incorporated sculptural elements that, if viewed alone, could be defined as applied art, I find that the Work as a whole clearly is not applied art. Thus, protection of the Work is not proscribed.

█ The same cannot be said of the "building directory," the "entrance steps 31st Street entrance," and the ceiling and wall lighting (with the exceptions noted above, *see supra* p. 13). These items clearly are works of applied art or strictly utilitarian objects. Hence, these items are not works of visual art and are not protected by VARA.

### iii. "Work Made For Hire"

Defendants argue that the Work is a work made for hire. As discussed above, works made for hire are specifically excluded from the definition of works of visual art. 17 U.S.C. § 101 defines a "work made for hire" in pertinent part as

> (1) a work prepared by an employee within the scope of his or her employment; or
>
> (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

It is undisputed that the second part of the definition quoted above does not apply to this case. Accordingly, defendants' argument that the Work was made for hire raises the question of whether plaintiffs were employees of the entities that commissioned the Work and, if they were, whether the Work was prepared within the scope of their employment.

The Copyright Act does not define the terms "employee" or "employment" and, therefore, "the application of these terms is left to the courts." *Aymes v. Bonelli,* 980 F.2d 857, 860 (2d Cir.1992). In *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989), the Supreme Court examined the legislative history of the Copyright Act and concluded that in order to "determine whether a work is for hire under the Act, a court first should ascertain, using principles of general common law of agency, whether the work was prepared by an employee or an independent contractor." 490 U.S. at 751, 109 S.Ct. at 2178. The *Reid* Court then enumerated factors relevant to the consideration of whether or not a hired party who creates a copyrightable work is an "employee" or an "independent contractor" for purposes of evaluating whether a given work is a "work made for hire." Factors relevant to this inquiry include

> the hiring party's right to control the manner and means by which the product is accomplished; ... the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

490 U.S. at 751–52, 109 S.Ct. at 2178–79 (footnotes and citations omitted). The *Reid* Court noted that "[n]o one of these factors is determinative." *Id.* at 752, 109 S.Ct. at 2179.

In *Aymes v. Bonelli,* 980 F.2d 857 (2d Cir.1992), the Second Circuit Court of Appeals reviewed the *Reid* factors and discussed the weight to be accorded certain factors. The *Aymes* Court first noted that, under *Reid,* "[i]t does not necessarily follow that because no one factor is dispositive all factors are equally important, or indeed that all factors will have relevance in every case." *Aymes,* 980 F.2d at 861. "The factors should not merely be tallied but should be weighed according to their significance in the case." *Id.* "[T]he *Reid* test was not intended to be applied in a mechanistic fashion," but rather each of the factors must be considered in light of its relative importance in the case. *Id.,* 980 F.2d at 862.

The Second Circuit found, however, that certain factors "will be significant in virtually every situation." *Id.* at 861. These factors include:

> (1) the hiring party's right to control the manner and means of creation; (2) the skill required; (3) the provision of employee benefits; (4) the tax treatment of the hired party; and (5) whether the hiring party has the right to assign additional projects to the hired party.

*Id.* Thus, the Court will begin consideration of whether plaintiffs were employees at the time they created the Work with an analysis of these five factors.

#### 1. The Reid *Factors Emphasized in* Aymes

##### a. The Right to Control

■ Sig, Corporate Life, and the Limited Partnership did not have the right to control the manner and means by which the Work was created, nor did these entities dictate the shape or style that the Work would take. Under the terms of the Contract, plaintiffs had "full authority in design, color and style" with regard to the Work. (DExh. NN). The only limitation placed on plaintiffs by the Contract was that the hiring party retained the authority to direct the location of the Work within the confines of the Property. (DExh. NN; HTr., at 195). As adduced at the trial and the preliminary injunction hearing, this limitation took the form of requiring plaintiffs to construct art work primarily within the Lobby. (*See, e.g.,* HTr., at 43–44).

Theodore Nearing, who was in charge of Property-related issues on behalf of Corporate Life and ultimately assumed Mr. Cohen's responsibility for managing the Property, testified that neither he, nor Corporate Life, had any input with respect to the design of the art work in the Lobby. (HTr., 195, 238). Mr. Nearing further testified that, to the best of his knowledge, Sig did not have any input with respect to the design or placement of the art work in the Lobby. (HTr., 195). I found this testimony to be credible.

Plaintiffs also testified that they had complete artistic freedom regarding the manner and means by which the Work was created. At the preliminary injunction hearing, Mr. Veronis testified that it was his understanding that the artists were retained to "make sculptures and install them in the lobby of the building. And it was our decision as to what these sculptures might look like and might appear to be. And we were at liberties to create them and put them up throughout the lobby area of the building." (HTr., at 33). At the time they were retained, plaintiffs understood that they were commissioned to design a lobby that would be a "museum" of their original art work. (HTr., at 21, 39–40). I credit this testimony.

Defendants failed to controvert plaintiffs' evidence on this point. One witness, Mr. Cohen, testified that he "dictated" what he wanted plaintiffs to do in creating the Work. (TTr., at 349). I did not find Mr. Cohen to be a credible witness. As an initial matter, Mr. Cohen's demeanor on the witness stand undermined his credibility. Second, Mr. Cohen's testimony at trial that he dictated the manner in which the Work was created is contradicted by his prior deposition testimony on this point. (*See, e.g.,* TTr., at 541–44, 552). Third, Mr. Cohen's contention that he could dictate to the artists is intrinsically questionable in light of his testimony that, although he made several suggestions to plaintiffs, these suggestions were largely ignored and he never took any action to force compliance with his suggestions. (TTr., at 531–36). Fourth, it became apparent at trial that Mr. Cohen might be sympathetic to

defendants' position in this litigation because he is aware that he may be sued by defendants for the actions that he took in relation to the Work should plaintiffs prevail in this action. (TTr., at 519–20, 528). Hence, I do not credit Mr. Cohen's testimony that he "dictated" to plaintiffs regarding the Work.

At trial it also was adduced that certain persons suggested alterations to the Work for safety, aesthetic, and pragmatic reasons. Similarly, the tenants of the building made suggestions concerning the Work, some of which were adopted by plaintiffs. I have considered this testimony and evidence and do not find that it materially limited plaintiffs' artistic freedom. Plaintiffs were open to suggestions by various persons, occasionally adopted those suggestions, and attempted to heed advice that would ensure that the Work was safe, lasting, and aesthetically pleasing. In sum, taken as a whole the record demonstrates that plaintiffs had virtually unfettered discretion in creating the Work.

■ In their post-trial submissions to this Court, defendants refer to plaintiffs' artistic freedom as "the phony factor." *Defendants' Post–Trial Memorandum of Law,* at 11. Defendants contend that the Court should give little weight to the issue of plaintiffs' artistic freedom, and argue that even if this Court does consider it, it is of no relevance. While defendants seem to concede that plaintiffs possessed significant artistic freedom, they argue that this freedom "was emblematic of [plaintiffs'] employment as professional artists." *Id.* The record does not support defendants' contention in this regard, however. Defendants apparently believe that every time one hires a professional artist, one must necessarily direct that artist to "create" and nothing more. This view is wholly without merit. One can easily postulate a situation in which a person or entity employs a professional artist for a specific chore and makes as a condition of employment compliance with certain artistic directions, *i.e.* to sculpt a five-foot tall rendition of corporate headquarters from marble, the same material from which the real headquarters building was constructed. This was not the case here.

In the instant case, I find that plaintiffs had unfettered artistic freedom to create the Work and that the hiring party did not have the right to control the manner and means of creation. I further find that, on the facts of this case, plaintiffs' artistic freedom strongly supports plaintiffs' contention that they were independent contractors rather than employees of Sig or the Limited Partnership.

**b. The Level of Skill**

■ The level of skill necessary to create the Work is highly relevant to the consideration of whether or not plaintiffs were employees or independent contractors. Plaintiffs are artists and sculptors, which, as numerous courts have recognized, are highly skilled occupations. *See, e.g., Reid,* 490 U.S. at 752, 109 S.Ct. at 2179. The parties to this action have stipulated that "[p]rofessional sculpting is a highly skilled occupation" (UF 4), and that each plaintiff is a professional sculptor (UF 1–3).

Defendants contend, however, that the creation of certain elements of the Work would not have required great artistic skill. Further, defendants argue that because plaintiffs delegated certain tiling work to others (UF 63), plaintiffs cannot be said to have required great skill to create the mosaic. I find these contentions to be without merit.

As discussed above, the Work is a single work of art. Plaintiffs conceived the design, created the art work, and executed the construction thereof. This entire process clearly required great skill. The use of paid and unpaid assistants working at plaintiffs' behest and under their direct supervision does not in any way demonstrate that plaintiffs did not require skill to create the Work.

I find that a high degree of skill was required to create the Work. I further find that this factor strongly supports plaintiffs' contention that they were independent contractors rather than employees.

**c. The Provision of Benefits to, and the Tax Treatment of, the Hired Parties**

■ It is undisputed that Sig and/or the Limited Partnership provided health and insurance benefits to plaintiffs through December 31, 1993. (HTr. 290–92, 295; UF 39–44;

DExh. B). Thereafter, plaintiffs continued to work on the Work without the provision of such benefits. (HTr., at 290–92; UF 45). It is also undisputed that in 1991, 1992, and 1993 plaintiffs received W–2 forms from either Sig or the Limited Partnership (UF 38), and that taxes were withheld from payments made to plaintiffs during this period (UF 33).

The provision of benefits to, and the tax treatment of, plaintiffs in this case supports defendants' contention that plaintiffs were employees. This factor is not determinative, however, especially in light of the fact that plaintiffs continued to work on the Work once the provision of benefits had ceased.

### d. The Right To Assign Additional Projects

▇▇▇▇▇ "[I]ndependent contractors are typically hired only for particular projects." *Aymes*, 980 F.2d at 863. Hence, when a hired party is hired to participate in numerous unspecified chores at the hiring party's discretion the hired party is likely to be an employee; conversely, when a hired party is hired to complete or achieve a specific task, it is more likely that the hired party is an independent contractor. In the instant case, the record supports plaintiffs' contention that plaintiffs were hired to complete a specific task, namely installing art on the Property.

As an initial matter, the Contract provides that plaintiffs were hired "*to design, create and install sculpture and other permanent installations ('the Sculptures') in The Factory*[8] and to render such other *related* services and duties as may be assigned to you from time to time . . . ." (DExh. NN) (emphasis added). Defendants do not contest that plaintiffs' sole responsibility was to install art work; instead they point to art work created by plaintiffs on the Property in places other than the Lobby and argue that these installations constitute projects separate from that undertaken by plaintiffs in the Lobby. While defendants' contention in this regard is true—plaintiffs did create art work on the Property other than that in the Lobby—it clearly does not undermine plaintiffs' contention that they were hired solely to install art

work on the Property, nor does it show that plaintiffs were employees.

Moreover, the record suggests that neither plaintiffs, Sig, nor the Limited Partnership viewed plaintiffs as employees who could be directed to complete tasks other than the installation of art work on the Property. For example, testimony adduced at trial showed that, on at least one occasion, plaintiffs were directed to complete a chore in another building. (TTr., at 347–48). Although plaintiffs refused to undertake this chore, they were not terminated, their pay was not docked, and they were not otherwise penalized for this failure to undertake another unrelated project. (TTr., at 347–48). In addition, while it is undisputed that one of the plaintiffs was a licensed structural steel welder during the relevant period of time, there is no evidence that he was ever asked to employ his welding skills to complete a project other than the art work.

Thus, I find that Sig, Corporate Life, and the Limited Partnership did not have the authority to direct plaintiffs to perform tasks other than the one they were hired to complete—the installation of art work on the Property. This factor weighs in favor of a finding that plaintiffs were independent contractors.

### 2. *Other* Reid *Factors*

Having examined the factors emphasized by the Second Circuit in *Aymes*, this Court must now consider the remaining *Reid* factors: (1) the source of the instrumentalities and tools; (2) the location of the work; (3) the duration of the relationship between the parties; (4) the extent of the hired party's discretion over when and how long to work; (5) the method of payment; (6) the hired party's role in hiring and paying assistants; (7) whether the work is part of the regular business of the hiring party; and (8) whether the hiring party is in business. The Court will examine each of these factors, and the relevance of each to this case, in turn.

The source of instrumentalities and tools is wholly inconclusive in the instant case. On

---

**8.** The Property was consistently referred to by plaintiffs, Sig, and the Limited Partnership as "The Factory."

the other hand, Sig and/or the Limited Partnership provided plaintiffs with certain tools and raw materials. (UF 53–56). On the other hand, plaintiffs also used their own tools in creating the Work, incorporated many "found" objects in the Work, and incorporated thousands of dollars worth of raw material into the Work for which they did not seek or receive reimbursement. (UF 52, 54, 57; HTr., at 458). Because I find that plaintiffs, Sig, and the Limited Partnership all provided the instrumentalities and tools used to create the Work, this factor is inconclusive in this case.

The location of the work also is not a helpful consideration in the instant case. While it appears from the record that some of the work occurred off the Property, the nature of the work that plaintiffs did required the majority to be done on site. Regardless of whether plaintiffs were independent contractors or employees, this work would have had to be done at the Property. Accordingly, the location of the work does not illuminate plaintiffs' status.

■ The duration of the relationship between plaintiffs on the one hand, and Sig and the Limited Partnership, on the other, strongly supports plaintiffs' contention that they were not employees of these entities. As this Court previously noted, plaintiffs "were not prior employees of [Sig or the Limited Partnership], nor would they be employed by [these entities] upon completion of the Work." *Carter*, 852 F.Supp. at 234. Defendants have failed to offer any evidence showing that plaintiffs would, in fact, have been retained by the hiring party following the completion of the Work. This finite term of engagement, *i.e.* engagement defined temporally in terms of the duration of a single project, is characteristic of a principal-independent contractor relationship.

■ The extent of the hired party's discretion over when and how long to work likewise weighs in favor of plaintiffs' contention that they were hired as independent contractors to create the Work. Plaintiffs "were required 'to work approximately forty (40) hours per week' at the Property." (UF 23). From the record, however, this number seems to have had little meaning in this case.

At the preliminary injunction hearing, plaintiffs proved that they had unrestricted 24–hour access to the Property, and often worked far in excess of the minimum number of hours contractually required of them. (UF 45–46; HTr. 21, 34, 85). When plaintiffs worked in excess of forty hours, their pay was not increased; when they worked less than forty hours, it was not diminished. (UF 45). Moreover, plaintiffs had no set hours and could and did work on the Work at times of their own choosing.

■ The method of payment, weekly checks in the amount of $1,000 to each of plaintiffs, is characteristic of an employer-employee relationship. Plaintiffs argue, however, that this sum in fact represents a lump sum payment apportioned over time. While plaintiffs' contention has some merit in light of the testimony and evidence in the record regarding how this method of payment was arrived at (HTr., at 459–60, 462, 469; UF 20), on the whole the record does not demonstrate that the weekly payments were intended as a lump sum payment apportioned over time. This contention is undermined by (1) the fact that the completion date for the Work was unspecified, and (2) plaintiffs' failure to prove that these payments were made toward a sum certain agreed to by the hiring and hired party in advance. On the record before the Court, then, this method of payment tends to support defendants' contention that plaintiffs were employees.

The hired party's role in hiring and paying assistants is not a helpful consideration in this case. Plaintiffs had complete discretion to retain unpaid assistants. Moreover, plaintiffs were responsible for selecting all assistants—paid and unpaid—whose only role was to assist plaintiffs. (UF 58). Thus, plaintiffs also had significant discretion with regard to the employment of paid assistants. Plaintiffs could not hire paid assistants, though, without the approval of Sig or the Limited Partnership (UF 59), and these paid assistants were paid directly by Sig or the Limited Partnership (UF 60; TTr., at 594). Finally, Mr. Veronis was responsible for overseeing

both paid and unpaid assistants that worked exclusively for plaintiffs. (TTr., at 595).

This factor is indeterminate because this factual scenario could be characteristic of a situation involving either employees or independent contractors. Plaintiffs' discretion to employ unpaid assistants, and their control over the selection of their paid assistants, is characteristic of an independent contractor retaining assistants. The requirement that plaintiffs obtain the approval of Sig or the Limited Partnership to hire paid assistants, and the fact that these paid assistants were paid by Sig or the Limited Partnership, could be characteristic of an employer exercising control over the retention and remuneration of lower-level employees, or of a principal exercising control over expenses in order to prevent cost overruns in connection with a project undertaken by an independent contractor. Plaintiffs' supervisory responsibility concerning their assistants is irrelevant to this Court's analysis, because this responsibility could attach either in the context of an independent contractor supervising assistants or an employee supervising lower-level employees. Thus, the hired party's role in hiring and paying assistants is wholly indeterminate in the instant case.

■ The final *Reid* factors that this Court must consider are whether the hiring party is in business and whether the Work is the type of work created in the regular course of the hiring party's business. The former factor "will always have very little weight in this analysis," *Aymes*, 980 F.2d at 863, and is not helpful in the instant case. With regard to whether creating the Work was part of the regular business of the hiring party, defendants strain to argue that it was, because prior to hiring plaintiffs, Mr. Cohen allegedly had attempted to use art to entice persons to become tenants of buildings that he owned or managed. *See Defendants' Post–Trial Memorandum*, at 28.[9] This contention is devoid of merit. "The purpose of this factor is to determine whether the hired party is performing tasks that directly relate to the objective of the hiring party's busi-

ness." *Aymes*, 980 F.2d at 863. Even assuming that Mr. Cohen had used art to entice tenants in the past (UF 15), the evidence in the record does not support defendants' apparent belief that plaintiffs were performing tasks that were directly related to the hiring party's business. As in *Reid* where "[c]reating sculptures was hardly 'regular business' for CCNV," 490 U.S. at 753, 109 S.Ct. at 2179, it is clear in the instant case that creating works of visual art was hardly "regular business" for either Sig or the Limited Partnership. Accordingly, this factor weighs in favor of a finding that plaintiffs were hired as independent contractors.

### 3. A Plus Factor: Ownership of Copyright

Generally when the Court is called upon to determine whether a hired party is an "employee" or an "independent contractor" under the Copyright Act, the purpose of that inquiry is to ascertain copyright ownership in a copyrightable work. If the Court determines that the hired party is an "employee," the copyright in the copyrightable work produced belongs to his or her employer. *See* 17 U.S.C. § 201(b). Conversely, if the Court finds that the hired party is an "independent contractor," the copyright belongs to the hired party.

■ The operative theory incorporated in the Copyright Act is that, when a party hires an employee to create a copyrightable work, the fruits of the employee's endeavors properly belong to the employer. The employer's mandate to the employee, and the scope of the employee's employment, contemplate the creation of copyrightable material for the employer's benefit.

■ Under VARA, however, the "work made for hire" analysis is undertaken for a different purpose: The hired party's employment status is analyzed to ascertain whether a work created by that party may be considered a "work of visual art." As such, it is logical to consider copyright ownership when the "work made for hire" analysis is necessary in an action seeking protection of a

---

9. As previously noted, I did not find Mr. Cohen to be a credible witness. Accordingly, the Court does not credit his testimony concerning his pri-

or installation of art work in properties that he owned or managed.

work of art under VARA. Among other things, this analysis, if helpful in a given case, can assist the Court in ascertaining how the interested parties viewed their own relationship.

■ As already discussed, the Contract provides that plaintiffs "shall retain copyrights" to the Work. (DExh. NN). I find that this factor is relevant to an analysis of plaintiffs' status in this case and that it supports a finding that plaintiffs were independent contractors rather than employees.

### 4. Conclusion: The Work is Not a "Work Made For Hire"

■ The factors that are significant in the instant case are: (1) the hiring party's right to control the manner and means of creation; (2) the skill required; (3) the provision of employee benefits to, and the tax treatment of, the hired party; (4) whether the hiring party had the right to assign additional projects to the hired party; (5) the duration of the relationship between the parties; (6) the extent of the hired party's discretion over when and how long to work; (7) the method of payment; and (8) whether creating the Work was part of the regular business of the hiring party. In addition, another factor, ownership of copyright, also is significant in this case. Other factors enumerated in *Reid* are indeterminate and irrelevant on the facts of this case: (1) the source of the instrumentalities and tools; (2) the location of the work; (3) the hired party's role in hiring and paying assistants; and (4) whether the hiring party is in business.

The tax treatment of plaintiffs and the method of payment support defendants' contention that plaintiffs were employees at the time the Work was created. The provision of benefits to plaintiffs also supports defendants' contention in this regard, but this factor's weight is diminished by the fact that both the hiring party and the hired parties appear not to have considered this a material condition of their business relationship: The Limited Partnership ultimately discontinued this practice and plaintiffs neither objected nor ceased construction of the Work.

I find that these factors are greatly outweighed by the remaining factors that are relevant in this case. Plaintiffs had autonomy to control the manner and means of creation, were skilled artisans who employed their considerable skill in creating the Work, were not subject to assignment of projects unrelated to that which they were hired to accomplish, had no prior relationship with the hiring party and would work for the hiring party only until the completion of the project, had significant discretion to determine when and how long to work, and the creation of works of art was not part of the hiring party's regular business nor a pursuit necessary to the accomplishment of the hiring party's business objectives.

On this basis alone, this Court must find that plaintiffs were independent contractors rather than employees. This finding is bolstered by a plus factor: Plaintiffs own the copyright to the Work. This indicates that the hiring and hired parties considered plaintiffs to be independent contractors. Accordingly, I find that plaintiffs were not employees at the time the Work was created and that the Work is not a "work made for hire" as that term is defined in the Copyright Act.

### iv. A "Work of Visual Art"

■ As already discussed, VARA defines a "work of visual art" as:

> a painting, drawing, print, or sculpture, existing in a single copy, in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author, or, in the case of a sculpture, in multiple cast, carved, or fabricated sculptures of 200 or fewer that are consecutively numbered by the author and bear the signature or other identifying mark of the author.

17 U.S.C. § 101. Plaintiffs have demonstrated that the Work is a single sculpture that incorporates elements drawn from other media. There is only one copy of this sculpture, which is located in the Lobby. The Work is not a "work made for hire" or "applied art," and is otherwise copyrightable. The Work was created and installed after the effective date of VARA. Accordingly, because it fits the definition of a "work of visual art" enun-

ciated in 17 U.S.C. § 101, the Work is entitled to treatment under VARA as a work of visual art.

### B. 17 U.S.C. § 106A(a)(3)(A): Prejudice to Plaintiffs' Honor or Reputation

Having found the Work to be a work of visual art, the Court must consider whether "intentional distortion, mutilation, or modification" of the Work would be "prejudicial to [plaintiffs'] honor or reputation." 17 U.S.C. § 106A(a)(3)(A). VARA, however, does not define the terms "prejudicial," "honor," or "reputation." Thus, the Court must construe these terms.

"It is axiomatic that 'the starting point in every case involving construction of a statute is the language itself.'" Landreth Timber Co. v. Landreth, 471 U.S. 681, 685, 105 S.Ct. 2297, 2301, 85 L.Ed.2d 692 (1985) (quoting Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring)); see also Samuels, Kramer & Co. v. Commissioner, 930 F.2d 975, 979 (2d Cir.) (same), cert. denied, —— U.S. ——, 112 S.Ct. 416, 116 L.Ed.2d 436 (1991). "The plain meaning of the statute's language should control except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" Samuels, Kramer & Co., 930 F.2d at 979 (quoting Griffen v. Oceanic Contractors, Inc., 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)). "In such cases it is the intention of the legislators, rather than the strict language, that controls." Id. Finally, " 'in expounding a statute, [courts] must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.'" Id. (quoting Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 51, 107 S.Ct. 1549, 1555, 95 L.Ed.2d 39 (1987)).

 Applying these principles to VARA, it is apparent that the terms "prejudicial," "honor," and "reputation" have readily understood meanings. "Prejudice" is commonly understood to mean "injury or damage due to some judgment of another." Webster's Third New International Dictionary (unabridged) 1788 (1971). "Honor" is com-

monly understood to mean "good name or public esteem." Id. at 1087. "Reputation" is commonly understood to mean "the condition of being regarded as worthy or meritorious." Id. at 1929. Use of these definitions will not cause a result that runs contrary to VARA's purpose. Therefore, this Court is convinced that these definitions were intended by VARA's drafters to be applied in interpreting the statute.

 Thus, in determining whether "intentional distortion, mutilation, or modification" of the Work would be "prejudicial to [plaintiffs'] honor or reputation," this Court will consider whether such alteration would cause injury or damage to plaintiffs' good name, public esteem, or reputation in the artistic community. Of course, the above-quoted definition of "reputation" does not require that the artists' reputation be derived independently of the art work that is the subject of this dispute. See H.R.Rep. No. 101–514, 101st Cong., 2d Sess. 15, reprinted in, 1990 U.S.C.C.A.N. at 6925 ("[A]n author need not prove a pre-existing standing in the artistic community. The Committee appreciates that less well-known or appreciated artists also have honor and reputations worthy of protection."). Moreover, the legislative history of VARA suggests an analytical framework within which to ascertain whether a given action may be prejudicial to artists' honor or reputation: "The Committee believes that the best approach to construing the term 'honor or reputation' . . . is to focus on the artistic or professional honor or reputation of the individual as embodied in the work that is protected. . . . The formulation for determining whether harm to honor or reputation exists must of necessity be flexible." Id. at 6925.

 The purpose of 17 U.S.C. § 106A(a)(3)(A) is to protect artists' integrity by forbidding alteration of works of visual art if such alteration would be prejudicial to the artists' honor or reputation. Testimony adduced at trial supports plaintiffs' contention that their honor and reputation would be damaged if the Work is distorted, modified, or mutilated. Professor Robert Rosenblum, a professor of art history at New York University, an art critic, and the author of nu-

merous books on art and art history testified as an expert witness that plaintiffs' reputation would be damaged if the Work is distorted. (HTr., at 106–07). I found Professor Rosenblum to be a well-qualified and credible witness. In addition, Jack S. Shainman, president and director of an art gallery specializing in contemporary art, also testified that mutilation of the Work would damage plaintiffs' honor or reputation. (TTr., at 207–08). I found Mr. Shainman to be experienced in the field of contemporary art and to be a credible witness. Similarly, Professor Darroll testified that plaintiffs' honor and reputation in the artistic community would be damaged if the Work is modified because the Work would then present to viewers an artistic vision materially different from that intended by plaintiffs. (TTr., at 185–87). I credit this testimony.

Defendants called Hilton Kramer to testify regarding, *inter alia*, plaintiffs' reputation and the quality of the Work. Mr. Kramer is currently employed as an editor of a monthly magazine that reviews art called "The New Criterion," and in the past has been employed by *The New York Times* as an art news editor and art critic. (TTr., at 289). Mr. Kramer's credentials as an art critic are well established. (TTr., at 324).

Mr. Kramer did not testify as to whether plaintiffs' honor or reputation would be damaged if the Work is distorted, modified, or mutilated. Rather, Mr. Kramer testified concerning the potential impact of removing the Work. (TTr., at 297). It is evident from the totality of Mr. Kramer's testimony, however, that he believes that alteration of the Work would not adversely impact plaintiffs' reputation because, in his opinion, the artists have no reputation. (TTr., at 297). Mr. Kramer bases his opinion to this effect on his belief that "[t]here is no literature to support the reputation or no literature of any significance." (TTr., at 297).

Weighing Mr. Kramer's opinion in this regard against that the other testimony on point, this Court finds more persuasive and more probative the testimony of Professor Rosenblum, Professor Darroll, and Mr. Shainman. Thus, I will accord this testimony greater weight on this point. While Professor Rosenblum, Professor Darroll, and Mr. Shainman are experts actively involved with contemporary art and in the contemporary artistic community, it appears from the record that Mr. Kramer's expertise is myopic. (TTr., at 321–22; *see also infra* note 13 and accompanying text). In addition, Mr. Kramer's criterion for determining whether plaintiffs' reputation would be harmed—that he is unaware of any "literature of any significance" concerning their work—encompasses only one factor that the Court must consider. In Mr. Kramer's opinion, no artist has a reputation in the art world unless Mr. Kramer is familiar with writings about that artist. I find this to be an unpersuasive basis for determining whether alteration of the Work would adversely affect plaintiffs' honor or reputation.

I find that plaintiffs indeed possess honor and reputations worthy of protection. While plaintiffs' collective reputation—as the Three Js—has been generated primarily in connection with the Work, each plaintiff also has preexisting honor and reputation as an artist in his own right. Finally, I credit Professor Rosenblum's, Professor Darroll's, and Mr. Shainman's testimony, based on their expertise in the area of contemporary art, that plaintiffs' reputations would be damaged by "intentional distortion, mutilation, or modification" of the Work.

## C. 17 U.S.C. § 106A(a)(3)(B): Recognized Stature

▮ 17 U.S.C. § 106A(a)(3)(B) provides that the author of a work of visual art shall have the right "to prevent any destruction of a work of recognized stature." This provision is preservative in nature: Congress was concerned that the destruction of works of art represented a significant societal loss. *See* H.R.Rep. No. 101–514, 101st Cong., 2d Sess. 16, *reprinted in*, 1990 U.S.C.C.A.N. at 6926; *see also* Edward J. Damich, *The Visual Artists Rights Act of 1990: Toward A Federal System of Moral Rights Protection For Visual Art*, 39 Cath.U.L.Rev. 945, 955 (1990) [hereinafter "Damich"].

▮ The phrase "recognized stature" is not defined in VARA. In light of the

preservative goal of this Section, however, the recognized stature requirement is best viewed as a gate-keeping mechanism—protection is afforded only to those works of art that art experts, the art community, or society in general views as possessing stature. A plaintiff need not demonstrate that his or her art work is equal in stature to that created by artists such as Picasso, Chagall, or Giacometti. As one commentator has noted, "The advantages of the 'of recognized stature' qualification include barring nuisance law suits, such as [a law suit over] the destruction of a five-year-old's fingerpainting by her class mate...." Damich, at 954; *see* Ginsburg, at 480 n. 19. Nor must the trier of fact personally find the art to be aesthetically pleasing; indeed, courts have persistently shunned the role of art critic. *See, e.g., Bleistein v. Donaldson Lithographing Co.,* 188 U.S. 239, 251–53, 23 S.Ct. 298, 300–01, 47 L.Ed. 460 (1903).

 The recognized stature requirement must be interpreted in such a manner as to maintain the preservative purpose of 17 U.S.C. § 106A(a)(3)(B) and in light of this Section's plain meaning. Thus, for a work of visual art to be protected under this Section, a plaintiff must make a two-tiered showing: (1) that the visual art in question has "stature," *i.e.* is viewed as meritorious, and (2) that this stature is "recognized" by art experts, other members of the artistic commu-

nity, or by some cross-section of society. In making this showing, plaintiffs generally, but not inevitably, will need to call expert witnesses to testify before the trier of fact.[10] Finally, in order to be entitled to injunctive relief, a plaintiff must show that the defendant has commenced destruction of, or intends to destroy, the subject art work.[11]

 Consideration of the testimony of the expert witnesses who testified at trial leads to the conclusion that the Work is a work of recognized stature.[12] For example, Professor Rosenblum testified that "this was [a] coherent ongoing program" and that he wants "everybody to go and see it." (HTr., at 102). Further, Professor Rosenblum testified that the sculpture is "a work of art like almost nothing I've ever seen before" (HTr., at 104), and that "the one thing that I know absolutely is that this is an incredible phenomenon and I want to see it again and learn more about it. And I am sure there are countless other people who would feel like me if they saw it" (HTr., at 106). I credit this testimony.

Furthermore, Kent Barwick, president of the Municipal Art Society of New York ("the Society"), and a former chairman of the New York City Landmarks Preservation Commission, was called by plaintiffs to testify as an expert witness. Mr. Barwick testified that the Society sponsors tours of "noteworthy

10. An earlier version of VARA provided that a "court or other trier of fact may take into account the opinions of artists, art dealers, collectors of fine art, and other persons involved with the creation, appreciation, history, or marketing of works of recognized stature." S. 1198, 101st Cong., 1st Sess., 135 Cong.Rec. S6811–13 (daily ed. June 16, 1989). Although this provision was eliminated from VARA prior to enactment, thus providing courts greater discretion with regard to what sources may be considered in determining whether a given work of visual art is a work of recognized stature, courts can, and should, consider these sources in determining whether a given work is of recognized stature.

11. Plaintiffs have made this showing in the instant case. Although defendants have backed off from their initial position somewhat (TTr., at 663), defendants' counsel has stated on the record that "it has already been conceded, I believe, or acknowledged on both sides that we don't want the sculptures there at all.... We don't want them there." *Carter v. Helmsley–Spear,*

*Inc.,* 94 Civ. 2922 (DNE) (May 31, 1994 Hearing Transcript), at 16; *see also* TTr., at 312. It is therefore clear from the record that defendants want to remove the Work. The art experts who were called to testify, including an expert witness called by defendants (TTr., at 302), uniformly agreed that removal of the Work would cause its destruction.

12. VARA does not delineate *when* a work must attain "recognized stature" in order to be entitled to protection under this Section. Considering the purpose of this Section, the Court does not view this as unintentional. The test is *whether* the art work at issue is of recognized stature, not *when* it attained this status. This interpretation is wholly consistent with the preservative goal of this Section. It should be noted, however, that there is evidence in the record that the Work became a work of recognized stature prior to the filing of plaintiffs' complaint in this action. (*See, e.g.,* HTr., at 111–18; TTr., at 46, 76–77, 79, 83).

works of art or architecture in the City of New York." (HTr., at 111). Mr. Barwick testified that, to this end, the Society organized a tour of the Work in February 1994. (HTr., at 111). Mr. Barwick stated that those who had gone on the February tour were "very, very excited" about the Work, and that they were anxious to have the tour of the Work made a permanent part of the Society's tour schedule. (HTr., at 111). Finally, Mr. Barwick testified that the Work constituted one of the great spaces located in New York (HTr., at 115) and that "it's very much in the public interest of the City of New York if it's at all possible to see this piece maintained and, if possible, finished" (HTr., at 117–18). I found Mr. Barwick to be a credible witness, and I credit this testimony.

Plaintiffs also called Professor Darroll as an expert witness to testify concerning the stature of the Work. As already noted, Professor Darroll teaches two- and three-dimensional design, and is an expert in visual art, including sculpture. Professor Darroll testified that he was "very exhilirated" by the Work, and that "[t]he imagination of the [W]ork is tremendous. It's overall a very exciting piece." (TTr., at 183). Professor Darroll then enumerated the standards that he uses to judge whether a given work is a work of stature. (TTr., at 189–90). Applying these standards to the Work, Professor Darroll opined that the Work has stature. (TTr., at 191). I found Professor Darroll to be well-qualified and credible, and I credit his opinion in this regard.

Defendants called Mr. Kramer, who testified as an expert witness that, in his opinion, the Work is not a work of recognized stature. (TTr., at 292–93). Mr. Kramer clearly does not like the Work, and during his direct testimony deemed it "a pastiche of recognized cliches." (TTr., at 298). Mr. Kramer further stated that "It is a work so lacking in merit that I believe that it serves no useful purpose to retain it." (TTr., at 300). As noted above, this Court qualified Mr. Kramer as an expert witness but finds that his opinion is so colored by his disdain for contemporary art in general as to be of little probative value.[13] Thus, I found Mr. Kramer's testimony in this regard to be unpersuasive and unconvincing and found the testimony of Professor Rosenblum, Professor Darroll, and Mr. Barwick both persuasive and probative.

On the record before the Court, I find that the Work is a work of recognized stature. Accordingly, the Work is entitled to protection under 17 U.S.C. § 106A(a)(3)(B).

### D. Defendants' Constitutional Arguments

 Defendants contend that if VARA is interpreted so as to protect the Work, VARA is unconstitutional. Defendants argue that VARA "violates the Fifth Amendment by giving a third party the right to control the use of Associates's property." *Defendants' Post–Trial Memorandum of Law*, at 61.[14] Defendants face a heavy burden in making this argument. *See, e.g., Federal Election Comm'n v. Political Contributions Data, Inc.*, 943 F.2d 190, 191 (2d Cir.1991) ("congress is presumed to have passed statutes

---

13. Mr. Kramer testified on cross examination that he believes that "most of the art in the current scene is of a shockingly low level" and that "the very notion of quality in art has been discarded." (TTr., at 322). From the record it is evident that he rejects contemporary art as intrinsically meritless. (TTr., at 321–23). Mr. Kramer's apparent disdain for contemporary art leads this Court to accord his opinion testimony significantly less weight than that of the other experts who testified, who are intimately familiar with evolving standards in the area of contemporary art.

14. Prior to the commencement of trial, defendants also raised an argument that VARA is unconstitutionally vague. Specifically, defen-

dants argued that the terms "honor," "reputation," and "stature" are not defined by VARA and their meanings cannot reasonably be ascertained. Defendants abandoned this argument following trial, however, and have not briefed this issue in their post-trial memorandum. Nevertheless, I note that the terms objected to by defendants have a common sense, easily understood meaning that should be apparent to all parties reviewing VARA. Like the statute reviewed in *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), VARA is "marked by 'flexibility and reasonable breadth, rather than meticulous specificity.'" 408 U.S. at 110, 92 S.Ct. at 2300 (citation omitted). Thus, VARA is not unconstitutionally vague.

which are constitutional"). For the reasons discussed below, defendants' constitutional arguments are both legally and factually without merit.

In *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922), the Supreme Court enunciated the foundation of modern takings jurisprudence, writing that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." In the ensuing decades the Supreme Court has repeatedly revisited the issues presented in *Pennsylvania Coal* in order to determine when regulation "goes too far." *See, e.g.,* Raymond R. Coletta, *Reciprocity of Advantage and Regulatory Takings: Toward a New Theory of Takings Jurisprudence*, 40 Am.U.L.Rev. 297 (1990) (collecting cases) [hereinafter "Coletta"]. Although no single test has been enunciated to ascertain whether a given law or regulation constitutes an impermissible taking absent compensation, the jurisprudence that has developed in this area sets the parameters of the inquiry and gives the Court significant guidance in the instant case.

In *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), the Supreme Court reviewed a regulatory scheme that bears relevant similarities to VARA. The regulation at issue in *Penn Central* was the New York City Landmarks Preservation Law ("Landmarks Law"), enacted by New York City to protect its "historic landmarks and neighborhoods from precipitate decisions to destroy or fundamentally alter their character." 438 U.S. at 109, 98 S.Ct. at 2651. The Landmarks Law enacted a comprehensive scheme whereby an eleven-member agency identified properties that had special character, or were of historic or aesthetic interest, designated those properties as "landmarks" and, once such designations were made, submitted these designations to the City Board of Estimate for approval, modification, or disapproval. *Id.* at 110–11, 98 S.Ct. at 2652–53. Following the Board of Estimate's decision on the status of a given property, the owner of a "landmarked" property could seek judicial review of the Board's decision. *Id.* Pursuant to the Landmarks Law, Grand Central Terminal ("the Terminal") was designated as a landmark, and material alteration of the Terminal was forbidden. As a result, the owner of the Terminal was prohibited from building an office tower above it. In *Penn Central*, the Supreme Court considered whether the Landmarks Law thus effected an impermissible taking.

In reaching its decision that the Landmarks Law did not effect an impermissible taking, the Court found that several factors militated against a finding that a taking had occurred: The Landmarks Law (1) implemented a comprehensive scheme designed to further the public interest; (2) did not specifically or disproportionately burden plaintiff; (3) left much of the commercial value of the property intact and did not interfere with plaintiff's primary economic use of the property; and (4) included some reciprocity of benefits. *See id.* at 133–35, 98 S.Ct. at 2664–65. As to this last point, reciprocity of benefits, the Court found it sufficient that the building owner was advantaged as a member of society; the benefit conferred did not necessarily need to flow directly to it in its capacity as a building owner. *Id.* at 134–35, 98 S.Ct. at 2664–65; *see also* Coletta, at 328–31, 335–39 (discussing reciprocity of benefits analysis). Finally, the Court emphasized that not every law which affects a property owner's right to control his property is a taking because " '[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.' " 438 U.S. at 124, 98 S.Ct. at 2659 (quoting *Pennsylvania Coal*, 260 U.S. at 413, 43 S.Ct. at 159).

 Like the regulation at issue in *Penn Central*, VARA may be viewed as impacting the use of land under certain circumstances. There are two major differences between the Landmarks Law and VARA, however, which underscore why VARA is not constitutionally impermissible. First, VARA applies only to those protected works that are installed *after* the effective date of the statute. This in and of itself undermines defendants' argument that VARA effects an unconstitutional taking. Second, any impact that VARA might

have on defendants' property is temporary: VARA protection subsists only for the life of the last surviving author of a covered work.

Even ignoring these factors, VARA does not effect an impermissible taking. VARA creates a comprehensive scheme, duly enacted by Congress, to protect and ensure the preservation of certain types of art work so as to advance the public interest and protect artists' moral rights. VARA is specifically designed to further the public interest.

Moreover, VARA does not disproportionately or unfairly target or burden defendants or the class to which defendants belong. VARA applies only to works installed after the effective date of the statute and permits those seeking to install VARA-covered art work to contractually waive VARA protection.

Furthermore, VARA facially does not diminish property value: It merely provides that once a decision is made to permit the installation of a work of visual art covered by VARA, the art work must remain for the life of the last surviving artist unless the artist or artists waive their VARA rights. On the facts of this case, it is clear that VARA leaves substantially all of the commercial value of the Property intact. It is apparent from the record that the Property can be, and regularly has been, leased to paying tenants. Thus, VARA does not deprive defendants of the primary commercial use of the Property.

VARA also yields reciprocal benefits. Artists benefit by having their work preserved and viewed in the form in which it was created. The public benefits through the preservation of those cultural resources that VARA protects. Building owners benefit both as members of society and, in the long run, by societal interest in the art that is located in their buildings. Indeed, it seems that the preservation of VARA-protected art work will in certain circumstances make owners' properties more, rather than less, commercially viable by generating public interest in those properties.

Defendants argue, however, that as applied here, VARA permits a third party, the net lessee, to permanently occupy defendants' building. In making this argument, defendants rely on *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), in which the Supreme Court held that "a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve." 458 U.S. at 426, 102 S.Ct. at 3171. In reaching this decision, the majority focused on that fact that the statute at issue deprived building owners of a traditional property right, the right to exclude unwanted persons from its property. The Court stated that

> The permanence and absolute exclusivity of a physical occupation distinguish it from temporary limitations on the right to exclude. Not every physical *invasion* is a taking. As *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980), *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), and the intermittent flooding cases reveal, such temporary limitations are subject to a much more complex balancing process to determine whether they are a taking. The rationale is evident: they do not absolutely dispossess the owner of his rights to use, and exclude others from, his property.

*Id.* at 435 n. 12, 102 S.Ct. at 3175 n. 12 (emphasis in original).

VARA neither facially nor as applied here permits the "permanent physical occupation" of property. As discussed above, VARA rights subsist for a limited period of time and are by no means permanent. Moreover, VARA does not authorize even a physical invasion: it merely protects certain art installed after the effective date of the statute.

■ Finally, defendants' contention that as applied to the facts of this case VARA permits a "permanent physical occupation" by authorizing the net lessee to control the use of defendants' land, is without merit. As a factual matter, it appears from the record that defendants' agents were aware that the Work was being installed and did not object. (UF 28; PExh. 41; TTr., at 224–26). The Work is easily noticeable and could not have been overlooked by anyone visiting the Property. Thus, the estoppel certificates issued

by Associates (PExh. 41) are particularly relevant because they support a finding that the net lessee had either actual or ratified authority to install the Work. In any event, to the extent that defendants believe that the former net lessee's actions were impermissible, they must seek redress against the former net lessee for any damages defendants claim to have sustained. This contention alone does not make VARA constitutionally impermissible.

In sum, defendants' constitutional arguments are without merit.

### E. The Scope of VARA Protection and Relief in the Instant Case

Plaintiffs have demonstrated that the Work is a single work of visual art, and that the "distortion, mutilation, or other modification" of the Work would be prejudicial to plaintiffs' honor and reputation. Furthermore, plaintiffs have shown that the Work is a work of recognized stature. Finally, plaintiffs have demonstrated that absent injunctive relief, defendants intend to distort, mutilate, modify, and destroy the Work. (*See, e.g. Carter v. Helmsley–Spear, Inc.*, 94 Civ. 2922 (DNE) (May 31, 1994 Hearing Transcript), at 16; TTr., at 99, 149–51, 229–32, 312).

#### i. Injunctive Relief

17 U.S.C. § 502(a) provides that "[a]ny court having jurisdiction of a civil action arising under [the Copyright Act] may ... grant temporary or final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." As amended, 17 U.S.C. § 501(a) includes violations of an author's rights under 17 U.S.C. § 106A(a) as actions infringing a copyright. In addition, the Court is vested with broad equitable powers to issue an injunction when the need for this remedy is established, *see, e.g., SEC v. Posner*, 16 F.3d 520, 521–22 (1994), and " 'has a wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct,' " *Etuk v. Slattery*, 936 F.2d 1433, 1443 (2d Cir.1991) (quoting *Springs Mills, Inc. v. Ultracashmere House, Ltd.*, 724 F.2d 352, 355 (2d Cir.1983)); *see Soltex Polymer Corp. v.*

*Fortex Indus. Inc.*, 832 F.2d 1325, 1329 (2d Cir.1987). Of course, this discretion must be exercised soundly in light of the relevant facts adduced at trial.

Plaintiffs are entitled to an injunction prohibiting defendants from distorting, mutilating, or modifying the Work. In addition, plaintiffs have shown that removing the Work would necessarily result in its distortion, mutilation, or modification because certain elements of the Work cannot be removed without being destroyed.

Further, plaintiffs are entitled to an injunction prohibiting defendants from destroying the Work. Because elements of the Work must be destroyed in order to be removed, the Work may not be removed from the Lobby.

Like Howard Roark in Ayn Rand's *Fountainhead*, plaintiffs wish to continue creating the Work regardless of the barriers to completion that are presented. Plaintiffs have not shown, however, that VARA gives them the right to complete, or engage in further work on, the Work. VARA mandates preservation of protected art work and the protection of artists' moral rights. It does not mandate creation. Nothing in the statute compels defendants to allow plaintiffs to engage in further creation. Contrary to plaintiffs' assertion, defendants' refusal to permit plaintiffs to "finish" the Work does not constitute "distortion, mutilation, or other modification" under 17 U.S.C. 106A(a)(3)(A).

#### ii. Damages, Costs, and Attorney's Fees

##### 1. Damages

17 U.S.C. § 501(a) provides that any person or entity that violates 17 U.S.C. § 106A(a) is an "infringer" of the "right of the author." In order to bring an action to recover damages for a violation of the rights conferred by 17 U.S.C. § 106A(a), the author of the relevant work of visual art need not have registered that work with the Register of Copyrights. 17 U.S.C. §§ 411 & 412. When an infringement of the author's moral rights has been shown, the author may recover, *inter alia*, either actual damages, 17

U.S.C. § 504(a) & (b), or at his or her election, statutory damages, 17 U.S.C. § 504(a) & (c).

■■■ Plaintiffs have demonstrated that defendants intend to violate their VARA rights. Accordingly, as already discussed, plaintiffs are entitled to prospective injunctive relief. Plaintiffs have not shown, however, that defendants have violated their VARA rights to date.

This Court heard testimony that certain sculptural elements have been temporarily altered or rendered inoperable by defendants and/or defendants' agents. (*See, e.g.,* TTr., at 99, 149–51). These alterations were quickly remedied. (TTr., at 177). While these temporary alterations coupled with other evidence in the record support a finding that defendants intend, in the absence of injunctive relief, to violate plaintiffs' VARA rights, these incidents in and of themselves do not constitute a violation of plaintiffs' rights under VARA. Plaintiffs failed to prove, among other things, that these brief alterations were prejudicial to their honor or reputation or that they have had the effect of destroying the Work. Thus, plaintiffs are not entitled to recover actual or statutory damages in connection with this claim.

### 2. Costs and Attorney's Fees

■■■ In the American system, parties to litigation generally must bear their own attorney's fees and litigation expenses. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 247–57, 95 S.Ct. 1612, 1616–21, 44 L.Ed.2d 141 (1975); *see also* Alan Hirsch and Diane Sheehey, *Awarding Attorney's Fees and Managing Fee Litigation* 1–2 (1994). The Copyright Act modifies this rule, however, for actions brought under VARA and the Copyright Act, which VARA amends. 17 U.S.C. § 505 provides that "In any civil action under [the Copyright Act], the court in its discretion may allow the recovery of full costs by or against any party.... Except as otherwise provided in [the Copyright Act], the court may also award a reasonable attorney's fee to the prevailing party as part of the costs." The Court may award costs and attorney's fees to a prevailing party in an action alleging the violation of an author's rights under VARA even if the subject work has not been registered with the Register of Copyrights. 17 U.S.C. §§ 411 & 412.

In *Fogerty v. Fantasy, Inc.,* —— U.S. ——, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994), the Supreme Court reviewed this Section as it concerns the imposition of reasonable attorney's fees. The *Fogerty* Court held that "attorney's fees are to be awarded to prevailing parties only as a matter of the court's discretion. 'There is no precise rule or formula for making these determinations,' but instead equitable discretion should be exercised 'in light of the considerations we have identified.'" —— U.S. at ——, 114 S.Ct. at 1033 (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 436–37, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983)). Among the factors that this Court may consider in exercising its discretion to award reasonable attorney's fees under this Section are: (1) the "'frivolousness'" of the action or defense, *id.,* —— U.S. at —— n. 19, 114 S.Ct. at 1033 n. 19 (quoting *Lieb v. Topstone Indus., Inc.,* 788 F.2d 151, 156 (3d Cir.1986)); (2) the "'motivation'" of the parties, *id.;* (3) "'objective unreasonableness (both in the factual and in the legal components of the case),'" *id.;* and "'the need in particular circumstances to advance considerations of compensation and deterrence,'" *id.*

■■■ Having weighed the relevant factors in the instant case, the Court finds that an award of costs and attorney's fees to plaintiffs would be inappropriate. The parties to this action vigorously contested each other's claims. In doing so, the parties were required to brief legal issues and engage in statutory interpretation without the guidance of direct precedent. This Court is the first district court in the country to interpret and apply the sections of VARA at issue here. On this basis alone it would be inappropriate to enter an award of costs and attorney's fees.

In addition, such an award is unnecessary to serve the interests of deterrence. The record demonstrates that defendants have complied with this Court's orders and have not violated plaintiffs' VARA rights to date. Should defendants violate this Court's orders

or plaintiffs' VARA rights in the future, this Court will not hesitate to order an appropriate monetary award, award costs and attorney's fees, or impose other appropriate sanctions.

In sum, I find that plaintiffs are not entitled to an award of costs and attorney's fees. Accordingly, plaintiffs' request for reimbursement of costs and attorney's fees in connection with their VARA claim is denied.

## II. PLAINTIFFS' SECOND CLAIM FOR RELIEF: COPYRIGHT INFRINGEMENT

■ Plaintiffs allege that defendants have willfully infringed plaintiffs' copyright in the Work and seek statutory damages and an award of attorney's fees in connection with this alleged infringement. (JPTO, at ¶ 4(a)(2)). As an initial matter, it is clear from the record that the Work is copyrightable and that plaintiffs own the copyright in the Work. (DExh. NN; UF 26).[15] It is undisputed, however, that plaintiffs have never obtained, or sought to obtain, registration of this copyright. (UF 26). Accordingly, defendants argue that this Court is without jurisdiction to decide plaintiffs' copyright infringement claim and that this claim must be dismissed.

■ Registration is not a prerequisite to copyright protection under the Copyright Act. 17 U.S.C. § 408(a); see also Alan Latman, Robert A. Gorman, Jane C. Ginsburg, *Copyright for the Nineties* 390–92 (1989) (tracing the evolution of the registration requirement and other copyright formalities). Registration is, however, a prerequisite to a suit alleging the infringement of the copyright of works, such as the one at the center of this dispute, whose country of origin is the United States. See 17 U.S.C. § 411(a) ("[N]o action for infringement of the copyright in any work shall be instituted until registration of the copyright claim has been made in accordance with this title.").[16] Moreover, the remedies for infringement are limited if the copyrightable work is not registered: "[N]o award of statutory damages or of attorney's fees ... shall be made for ... any infringement of copyright in an unpublished work commenced before the effective date of its registration." 17 U.S.C. § 412.

■ Because proper registration is a prerequisite to an infringement suit, this Court is without jurisdiction to decide plaintiffs' claim that defendants have infringed their copyright in the Work. See, e.g., Wagstaff–El v. Carlton Press Co., 913 F.2d 56, 58 (2d Cir.1990) (stating that dismissal for failure to prove valid registration was proper), cert. denied, 499 U.S. 929, 111 S.Ct. 1332, 113 L.Ed.2d 263 (1991); Whimsicality, Inc. v. Rubie's Costume Co., 891 F.2d 452, 453 (2d Cir.1989) ("proper registration is a prerequisite to an action for infringement"); Conan Properties Inc. v. Mattel, Inc., 601 F.Supp. 1179, 1182 (S.D.N.Y.1984) (copyright infringement claim barred absent proof that copyright has been registered).[17] The cases cited by plaintiffs in support of their contention that this Court has jurisdiction to decide their infringement claim, see Plaintiffs' Post–Trial Memorandum, at 33 n. 28, are inapposite. Accordingly, plaintiffs' claim for copyright infringement, and for recovery of statu-

---

15. The parties have stipulated that plaintiffs own the copyright to the Work. (UF 26). In addition, defendants have stated that they "have no objection to providing plaintiffs with reasonable additional access [to the Work] for the purpose of exploiting their copyright." *Defendants' Post–Trial Memorandum of Law*, at 77. Moreover, this Court has broad equitable power to enjoin defendants from denying plaintiffs and their invitees access to the Work for the purpose of exploiting this copyright. See, e.g., Community for Creative Non–Violence v. Reid, 86 Civ. 1507 (TPJ), 1991 WL 370138 at *1–2, 1991 U.S. Dist. LEXIS 20227, slip op., at *2–*3 (D.D.C. Oct. 16, 1991).

16. Although not relevant in this case, 17 U.S.C. § 411(a) also provides that

where the deposit, application, and fee required for registration have been delivered to the Copyright Office in proper form and registration has been refused, the applicant is entitled to institute an action for infringement if notice thereof, with a copy of the complaint, is served on the Register of Copyright.

17. Assuming that plaintiffs register the Work with the Register of Copyrights, the Court would have jurisdiction over a suit brought by plaintiffs in the future should defendants engage in conduct subsequent to the filing of this Opinion that constitutes copyright infringement under the Copyright Act.

tory damages and attorney's fees in connection therewith, is dismissed.

### III. PLAINTIFFS' THIRD CLAIM FOR RELIEF: TORTIOUS INTERFERENCE WITH CONTRACT

Plaintiffs allege that, by prohibiting plaintiffs from engaging in further work on the Work and by barring them from the Property, defendants tortiously interfered with a contract between plaintiffs on the one hand, and Sig or the Limited Partnership on the other. (JPTO, at ¶ 4(a)(3)). This claim, based on New York law, is brought pursuant to this Court's supplemental jurisdiction. *See* 28 U.S.C. § 1367(a).

■ In order to recover on a claim of tortious interference with contractual relations under New York law, plaintiffs must prove four elements: "(1) the existence of a contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and (4) damages to plaintiff." *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 595 N.Y.S.2d 931, 934, 612 N.E.2d 289, 292 (1993) (citing *Israel v. Wood Dolson Co.*, 1 N.Y.2d 116, 120, 151 N.Y.S.2d 1, 134 N.E.2d 97 (1956)). The New York Court of Appeals has described this cause of action in the following manner:

> The American Law Institute in the Restatement of the Law of Torts 2d, adopted May, 1977, has stated the fundamental principle: "One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract." (§ 766.) The keystone of the statement is the adverb "improperly" ... the definition of which is inconstant and mutable, drawing its substance from the circumstances of the particular situation at hand. Section 767 of the Restatement sets out several factors for consideration in determining whether an intentional interfer-

ence with a contract is "improper", accompanied by the observation that "[the] issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another. The decision therefore depends upon a judgment and choice of values in each situation" (Comment b).

*Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 428 N.Y.S.2d 628, 631–32, 406 N.E.2d 445, 447–49 (1980). The factors set out in Section 767, to which the *Guard–Life* court refers are:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

Restatement of the Law of Torts (second) § 767. For the reasons discussed below, I find that plaintiffs have failed to prove defendants' "intentional inducement of the third party to breach or otherwise render performance impossible." *Kronos, Inc.*, 81 N.Y.2d 90, 595 N.Y.S.2d at 934, 612 N.E.2d at 934.

■ Defendants' conduct vis-a-vis the events alleged by plaintiffs must be examined in light of the state of mind, intent, and knowledge of defendants at the time the events that gave rise to this claim occurred. There is some evidence in the record that suggests defendants initially excluded plaintiffs from the Property after one of defendants' agents became angry when a gong that is incorporated in the Work rang in his close proximity. (TTr., at 118, 122–24, 171–75). It appears from the record, however, that this incident was brief in duration and was a minor factor in the exclusion of plaintiffs from the Property. The record as a whole supports defendants' contention that, at the time they denied plaintiffs access to the Property, they believed they were exercising their prerogative as owners of the

Property to exclude unwanted persons from the premises and to prevent the ongoing installation of art that they did not find aesthetically pleasing.

Plaintiffs have not demonstrated that the nature of defendants' conduct—excluding unwanted persons from the Property and preventing further installation of art work—was patently unreasonable at the time the conduct occurred. In addition, plaintiffs have not demonstrated that defendants' motives, or the interests that they sought to advance, were improper. While it appears that defendants' actions did have the effect of interfering with the fulfillment of the Contract, plaintiffs have failed to show that this was defendants' purpose in excluding plaintiffs.

Finally, any damage to plaintiffs as a result of defendants' actions was negligible since (1) plaintiffs have not demonstrated that they have the right to conduct further work on the Work, and (2) the entity with whom plaintiffs had contracted to create the Work entered bankruptcy proceedings a day after plaintiffs were excluded and could no longer pay them. While plaintiffs may well have been upset when they were barred from the Property (TTr., at 63–64), I do not credit plaintiffs' contention that they suffered damage in the form of mental anguish or emotional distress.

In sum, on the record before the Court, I find that plaintiffs have failed to prove that they are entitled to recover on their claim for tortious interference with contract, and this claim is therefore dismissed.

## IV. PLAINTIFFS' FOURTH CLAIM FOR RELIEF: UNLAWFUL EJECTION FROM REAL PROPERTY

■ Plaintiffs' next supplemental state law claim seeks recovery for unlawful ejection from the Property. (JPTO, at ¶ 4(a)(4)). Plaintiffs aver that "[d]efendants have unlawfully ejected plaintiffs from property on which they were legally entitled to be present *under the license* granted them by Sig and/or the Limited Partnership." (JPTO, at ¶ 4(a)(4)) (emphasis added). Plaintiffs state that "There is no dispute that, as of April 7, 1994, *plaintiffs were licensees* entitled to be on the Property," *Plaintiffs' Post–Trial Memorandum*, at 36 (emphasis added), and argue that they are therefore entitled to recover damages pursuant to New York Real Property Actions and Proceedings Law Section 853 ("RPAPL § 853").[18] Defendants argue that, because plaintiffs were either employees[19] or mere licensees, plaintiffs cannot recover under RPAPL § 853. *See Defendants' Post–Trial Memorandum of Law*, at 87–88.

---

**18.** It should be noted that Black's Law Dictionary defines a licensee as: "A person who has a privilege to enter upon land arising from the permission or consent, express or implied, of the possessor of land but who goes on the land for his own purpose rather than for any purpose or interest of the possessor." *Black's Law Dictionary* 830 (5th ed. 1979). In contrast, Black's Law Dictionary defines an "invitee" in the following manner: "A person is an 'invitee' on land of another if (1) he enters by invitation, express or implied, (2) his entry is connected with the owner's business or with an activity the owner conducts or permits to be conducted on his land and (3) there is mutuality of benefit or benefit to the owner." *Id.* at 742. These definitions are consistent with those employed by New York courts. *See, e.g., Davis v. Shelton*, 33 A.D.2d 707, 304 N.Y.S.2d 722, 725 (1969); *LeMay v. General Elec. Co.*, 114 Misc.2d 445, 451 N.Y.S.2d 990, 993 (Sup.Ct.1982).

Because plaintiffs concede that they were "licensees," and defendants argue that plaintiffs were licensees if they were not employees (which, the Court has found, they were not), the

Court will not consider whether plaintiffs were licensees or invitees under New York law. Because plaintiffs' concession here is somewhat puzzling, it must be assumed that plaintiffs' primary contention on this claim is that they are entitled to recover damages stemming from defendants' allegedly wrongful lock-out of plaintiffs from a space adjacent to the Lobby that plaintiffs had formerly used as a work shop. Arguably, this space was licensed to plaintiffs in their status as independent contractors for their sole benefit, since provision of this space relieved plaintiffs of the necessity of maintaining a separate studio off-site and may not have inured to Sig's, Corporate Life's, or the Limited Partnership's benefit. Because it is not clear whether plaintiffs seek recovery of damages in connection with their ejection from this space alone, or also from the Lobby and/or the entirety of the Property to which they previously had access, this Court will consider plaintiffs' fourth claim for relief in relation to all of the aforementioned areas.

**19.** As noted above, this Court rejects this contention and finds that plaintiffs were independent contractors. *See supra* p. 322.

RPAPL § 853 provides that

> If a person is disseized, ejected, or put out of real property in a forcible or unlawful manner, or, after he has been put out, is held and kept out by force or by putting him in fear of personal violence or by unlawful means, he is entitled to recover treble damages in an action therefor against the wrongdoer.

N.Y.Real Prop.Acts. and Proc. § 853 (McKinney 1994). One commentator has expressed the reach of this provision in the following manner:

> RPAPL 853. and its predecessor, New York's forcible and detainer statute, were enacted to discourage undue intimidation and violence in the ejection of persons from real property by providing for treble damages under certain circumstances, but not to prohibit resort to summary ouster. The decision by the Court of appeals in *Napier v. Spielmann*, 1909, 196 N.Y. 575, 90 N.E. 1162, that a tenant or licensee acquired no possessory interest in property is still valid authority. While it is true that *tenants* as defined in RPAPL 711 may be evicted only through legal proceedings, others, such as licensees and squatters, who are covered by RPAPL 713, are not so protected. While RPAPL 713 permits a special proceeding as an additional means of effectuating removal of non-tenants, it does not replace an owner's common-law right to oust an interloper without legal process. *P & A Bros., Inc. v. City of New York Dept. of Parks & Recreation*, 1992, 184 A.D.2d 267, 585 N.Y.S.2d 335.

John J. Meehan, *Supplemental Practice Commentary* (1993) (emphasis in original), *reprinted in,* 49.5 McKinney's Real Prop. Acts. and Proc. (1994 Cumulative Annual Supp.), at 145. Under New York law, "[w]hile it is true that tenants ... may be evicted only through lawful procedure, others, such as licensees ... who are covered by RPAPL 713 are not so protected. Thus, RPAPL 713 merely permits a special proceeding as an additional means of effectuating the removal of nontenants, but it does not replace an owner's common-law right to oust an interloper without legal process." *P & A Bros., Inc. v. New York Dep't of Parks &*

*Recreation,* 184 A.D.2d 267, 585 N.Y.S.2d 335, 336 (1992) (citations omitted); *but see Friends of Yelverton, Inc. v. 163rd Street Improvement Council, Inc.,* 135 Misc.2d 275, 514 N.Y.S.2d 841, 843 (N.Y.City Civ.Ct.1986) (deeming defendant's action in evicting licensee without resort to summary proceedings improper on the facts presented). It has long been the rule in New York that a licensee, as opposed to a tenant or one having a greater interest in the use of particular real property, cannot maintain an action for wrongful ejection. *See, e.g., Napier v. Spielmann,* 127 A.D. 567, 111 N.Y.S. 983, 985–86 (App.Div.1908). RPAPL § 853 does not alter this fundamental rule.

■ Because plaintiffs concede that they were mere licensees in relation to the relevant areas, plaintiffs cannot recover for unlawful ejection from the Property. In addition, I note that even if plaintiffs were more than mere licensees to the relevant space, plaintiffs have not shown that defendants engaged in the type of wrongful conduct proscribed by RPAPL § 853. Accordingly, plaintiffs have failed to demonstrate that they are entitled to recover on their unlawful ejection claim, and this claim is therefore dismissed.

## V. DEFENDANTS' COUNTERCLAIM: WASTE

In their counterclaim, defendants allege that "The creation of the [W]ork has resulted in violations of the Building and Fire Code of the City of New York, has materially changed the nature and character of the [Property], and has resulted in a diminution of the market value of the Property." (JPTO, at ¶ 4(b)). "Defendants' counterclaim alleges that plaintiffs have committed waste with respect to the Property," *Defendants' Post–Trial Memorandum of Law,* at 89, and is brought pursuant to this Court's supplemental jurisdiction.

■ An analysis of the doctrine of waste at common law, as reformulated in the Restatement of the Law of Property (second), and as interpreted and applied in New York, conclusively demonstrates that an action for waste can be brought exclusively by a landlord or property owner against a ten-

ant. The common law recognized three actionable types of waste in connection with real property: (1) voluntary waste, also known as affirmative waste, (2) permissive waste, and (3) ameliorative waste. Each of these varieties of waste arises in the context of a landlord-tenant relationship: either the tenant does something, or fails to do something that it is obligated to do, that fundamentally changes the nature of the property that reverts to the owner at the conclusion of the tenancy. As traditionally defined, voluntary waste occurs when a tenant intentionally or negligently damages the premises; permissive waste occurs when the tenant fails to prevent damage to the premises from the elements, such as by failing to replace a broken window that ultimately leads to water damage; and ameliorative waste occurs when a tenant alters a premises such that it is of changed character at the time it is returned to the owner.

■ Section 12.2 of the Restatement of the Law of Property (second) discusses and reformulates these concepts. Although the Restatement departs somewhat from the common law formulation of the different types of waste, it recognizes that an action in waste lies exclusively in the context of the landlord-tenant relationship: When the action or inaction of a tenant results in a "change in the physical condition of the leased property" an action in waste may lie. *See* Restatement of the Law of Property (second) § 12.2 & comment a.

■ The New York formulation of waste—as applied in connection with real property—is limited to matters presenting a landlord-tenant relationship. In *Rumiche Corp. v. Eisenreich,* 40 N.Y.2d 174, 386 N.Y.S.2d 208, 352 N.E.2d 125 (1976), the New York Court of Appeals discussed the common law cause of action for waste in connection with real property:

[A]t common law waste had three different definitions, each related to particular types of conduct on the part of tenants. Involuntary waste was defined as failure to prevent damage to the premises, in other words negligence. Equitable waste was defined as failure to do what a prudent owner would do and was available as a

cause of action only in limited circumstances.... [V]oluntary waste ... occurs when a tenant injures the premises by an affirmative act (see 5 Powell, Real Property, par. 640; 63 N.Y.Jur., Waste, § 2, p. 109, and cases cited therein).

\* \* \* \* \* \*

It is the impingement upon the ultimate estate of the landlord which is the keynote to the definition of waste (Rasch, New York Landlord and Tenant [2d ed.], § 455). Its application in a modern landlord-tenant setting is well described in *Pross v. Excelsior Cleaning & Dyeing Co.,* 110 Misc. 195, 201, 179 N.Y.S. 176, 179: "[S]uch a change as to affect a vital and substantial portion of the premises, as would change its characteristic appearance, the fundamental purpose of the erection, or the uses contemplated, or a change of such a nature, as would affect the very realty itself—extraordinary in scope and effect, or unusual in expenditure."

*Rumiche Corp.,* 40 N.Y.2d 174, 386 N.Y.S.2d at 210–11 (footnote omitted). Thus, in order to recover on a claim of waste, the party seeking recovery must show at a minimum: (1) that a *tenant* has taken some action, or failed to take required action, *id.;* (2) that as a result of the tenant's action or failure to act the fundamental character of the property has been changed, *id.;* and (3) the action or inaction has caused "permanent or lasting damage.... [N]ot every change or alteration made by a tenant constitutes waste," *id.* at 211.

As to the first requisite showing, however, defendants contend that the party accused of waste need not be a tenant, but instead may be a third party. In support of this curious proposition, defendants cite two cases decided by the Third and Fourth Departments of the New York Supreme Court Appellate Division in 1907 and 1914 respectively. Contrary to defendants' contention, the first case they have cited, *Morgan v. Waters,* 122 A.D. 340, 106 N.Y.S. 882 (1907), actually supports the proposition that an action in waste *cannot* be brought against a non-tenant third party. In *Morgan,* the respondent argued that the action could not lie because "an

action in waste cannot be maintained against a stranger." 122 A.D. at 342, 106 N.Y.S. 882. The *Morgan* court did not disagree but wrote that "this is not strictly an action of waste. In *Livinston v. Haywood* (11 Johns. 429) the action of waste is recognized against the tenant, but it is held that a revisioner may have an action of trespass against a stranger. The limitations of the Code, therefore, applicable to an action of waste brought thereunder do not in any way limit plaintiffs' right of action here." *Id.* Thus, *Morgan* is not inconsistent with later New York cases on point holding that an action in waste in connection with real property may by pursued only by a landowner/landlord against a tenant.

The second case cited by defendants, *Iroquois Brewing Co. v. Thomas Cusack Co.*, 147 N.Y.S. 1117 (App.Div.1914), likewise does not hold that an action for waste can lie against a non-tenant. This one-paragraph memorandum order reversing a lower court determination does not state that an action in waste may lie against a non-tenant, but rather that a non-tenant defendant could be liable "under section 1651 of the Code of Civil Procedure, as assignee of the tenant" when defendant's actions may have caused "damage to the building in the nature of waste." *Iroquois Brewing Co.*, 147 N.Y.S. at 1117. Thus, *Iroquois Brewing* is inapplicable on the facts of this case because defendants have neither alleged nor shown that plaintiffs were assignees of the tenant. It also does not support the proposition for which defendants have cited it because *Iroquois Brewing* simply does not hold that an action sounding in waste and in the context of real property can be maintained against a non-tenant. Finally, even if it were read to support this proposition, *Iroquois Brewing* would no longer be controlling authority in light of subsequent pronouncements by the New York Court of Appeals to the contrary.

■ Defendants' counterclaim is therefore deficient. First, the parties against whom the counterclaim is asserted were not tenants, but rather were independent contractors hired by the net lessee and/or its agents. To the extent that an action for waste may lie, defendants have moved against the wrong party. Defendants must pursue their claim sounding in waste, if at all, against the former net lessee.

■ Second, defendants have not shown that the fundamental character of the Property has been changed. The Property is a commercial building in which space is leased to retail, commercial, and light manufacturing entities. Plaintiffs' actions have not had any impact on this fundamental character.[20]

■ Third, defendants have not shown that plaintiffs' actions have caused any permanent or lasting damage to the Property. Defendants have shown that certain parts of the Property are not currently in compliance with New York City building and electrical codes. This is not determinative, however. As an initial matter, defendants' experts have testified that, with one minor exception, any noncompliance with applicable codes can be remedied without altering the Work. Thus, any "damage" of this variety certainly is not permanent or lasting. Moreover, under the terms of the Net Lease, the net lessee—not plaintiffs—was responsible for ensuring compliance with applicable codes. (DExh. BBB, at 10–11 §§ 6.03–6.04).

■ Defendants' counterclaim therefore fails both as a matter of law and fact. Under New York law, a claim for waste in the context of real property may be maintained only against a tenant, not a third party independent contractor hired by the tenant. Even assuming that such a claim could lie, defendants have not established the factual predicate for such a claim against plaintiffs. Accordingly, defendants' counterclaim must be dismissed.

## CONCLUSION

For the reasons discussed above, plaintiffs' second, third, and fourth claims for relief are dismissed with prejudice. Defendants' coun-

---

**20.** Although the attachment of sculptural elements to the ceiling of the Lobby may have decreased the "live load" of the floor immediately above the Lobby, it is clear from the record that this alteration is negligible and does not impact the fundamental character of the Property.

terclaim is also dismissed with prejudice. Plaintiffs' requests for an award of money damages and for reimbursement of costs and attorney's fees in connection with their first claim for relief is denied.

Plaintiffs are entitled to injunctive relief with regard to their first claim for relief:

Accordingly, IT IS HEREBY ORDERED that defendants, their agents, their employees, and their representatives are enjoined from (1) distorting, mutilating, or modifying plaintiffs' art work (defined herein as "the Work") installed or located in the Lobby of the Property located at 47–44 31st Street, Queens, New York; (2) destroying this art work; and/or (3) removing this art work, or any portion thereof; and

IT IS FURTHER ORDERED that this injunction pertains only to that art work that has been defined herein as "the Work" (the sculptural installations and sculptural elements that are located within the confines of the Lobby of the Property located at 47–44 31st Street, Queens, New York), including, but not limited to (1) art work affixed to, or otherwise located in or on, the floor, walls, and ceiling of the Lobby, including the floor and wall mosaic, and (2) the interior of the three elevators that open into the Lobby; and

IT IS FURTHER ORDERED that this injunction does not prohibit the distortion, mutilation, modification, destruction, or removal of (1) art work created by plaintiffs in areas of the Property other than the Lobby; (2) the entrance steps at the 31st Street entrance; (3) the "building directory;" or (4) lighting fixtures or lighting structures located within the confines of the Lobby, except that this injunction does prohibit distortion, mutilation, modification, destruction, or removal of the "florescent snake," the "illuminated floor placque," "the chandelier," and lighting elements directly incorporated into the Work such as the headlights of the bus; and

IT IS FURTHER ORDERED that this injunction does not prohibit defendants from employing a licensed electrician to rewire sculptural elements within the Lobby in order to bring those elements into compliance with applicable electrical codes, provided that such rewiring does not change the physical appearance of rewired elements or alter their mechanical function; and

IT IS FURTHER ORDERED that the parties may, without violating this injunction, expressly agree in writing to distort, mutilate, modify, destroy, or remove the Work or any portion thereof provided this agreement is (1) embodied in a written agreement, (2) signed by each of the then-living plaintiffs as well as by defendants' agent or successor in interest, and (3) dated and notarized; and

IT IS FURTHER ORDERED that nothing in this injunction shall confer upon plaintiffs the right to engage in further creation of the Work, except that plaintiffs may, at their own expense, and within ninety (90) days of the date of this Opinion, repair (1) the "astronaut" and (2) the "illuminated floor placque," which became dysfunctional subsequent to the commencement of this suit. If plaintiffs elect to make these repairs, defendants may elect to have any necessary electrical work completed by a licensed electrician working under plaintiffs' supervision, provided however, that if defendants make this election the costs associated with hiring the licensed electrician shall be born by defendants; and

IT IS FURTHER ORDERED that, whereas plaintiffs have demonstrated that they own the copyright to the Work and the right to exploit that copyright, defendants are enjoined from denying plaintiffs and their invitees reasonable access to the Lobby. For the purpose of this order, reasonable access shall be defined as access Monday through Saturday, except for federal and state holidays, between the hours of 10:00 a.m. and 5:00 p.m.; and

IT IS FURTHER ORDERED that this injunction will remain in effect until the death of the last surviving author of the Work. For the purpose of this order, the authors of the Work are John Francis Carter, John Meade Swing, and John James Veronis, Jr.; and

IT IS FURTHER ORDERED that the preliminary injunction issued by this Court in this case on May 18, 1994 is vacated; and

IT IS FURTHER ORDERED that the Clerk of the Court is directed to enter judgment in accordance with this Opinion & Order.

SO ORDERED.